# EXHIBIT A

**PLAINTIFF'S PROPOSED AMENDED COMPLAINT**

| | |
|---|---|
| HEIDI A. TAITT and G. PAUL TAITT, | ) **Civil Action No.: 2:25-cv-00008-LEW** |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| SELECT PORTFOLIO SERVICING, INC., | ) |
| | ) |
| and | ) |
| | ) |
| U.S. BANK NATIONAL ASSOCIATION, | ) AMENDED VERIFIED COMPLAINT |
| individually and in its capacity as trustee for | ) AND DEMAND FOR JURY TRIAL |
| CIM Trust 2020-R3, Global Structured | ) |
| Finance – CIM Trust 2020-R3, and any | ) |
| other mortgage-backed securities trusts or | ) |
| associated entities that U.S. Bank claims, | ) |
| alleges, or has asserted are associated with | ) |
| the mortgage loan purportedly secured by | ) |
| Plaintiffs' property, for which it serves or | ) |
| has served as trustee, owner, servicer, or in | ) |
| any other fiduciary or contractual capacity, | ) |
| Defendants. | ) |

## AMENDED VERIFIED COMPLAINT

Plaintiffs, Heidi A. Taitt and G. Paul Taitt (collectively, "Plaintiffs"), bring this Verified Complaint

against Defendants Select Portfolio Servicing, Inc. ("SPS") and U.S. Bank National Association,

individually and in its capacity as trustee ("U.S. Bank") (collectively referred to as "Defendants"), and

allege as follows:

This action arises from 14 years of continuous and unlawful conduct by SPS, U.S. Bank, and their

predecessors, stemming from an alleged loan purportedly secured by Plaintiffs' property. Defendants

have engaged in a pattern of misconduct, including reliance on fraudulent documentation, glaring

discrepancies in the alleged promissory note and mortgage assignments, and deliberate

misrepresentations about the ownership and enforceability of the alleged loan. These actions have

inflicted significant financial losses, irreparable harm to the title of Plaintiffs' property, and substantial emotional distress including physical harm.

Defendants have compounded this harm by introducing fraudulent documentation into the property's chain of title, concealing critical information about the alleged loan, and ignoring glaring discrepancies in the purported promissory note and mortgage assignments. Further, Defendants have flagrantly violated Maine consumer protection laws **(5 M.R.S.A. § 205-A)** and employed deceptive practices to assert false claims of ownership and enforceability over the alleged loan, despite clear evidence of material defects in the supporting documentation.

As a direct result of Defendants' actions, Plaintiffs have suffered irreparable damage to the title of their property, rendering them unable to sell, transfer, or otherwise enjoy their property free from legal uncertainty. In addition to this clouded title, Defendants' conduct has caused severe financial instability, violated Plaintiffs' property rights, and profoundly impacted their quality of life.

### THE PARTIES

1.      **Plaintiffs:** Heidi A. Taitt and G. Paul Taitt are individuals residing at 55 Thompson Lane, Hartford, Maine 04220. Plaintiffs are the rightful owners of this property and have a vested interest in addressing and resolving the clouded title and defective documentation issues created by Defendants. They have suffered extensive financial, emotional, and physical harm due to Defendants' actions and failure to correct critical defects in the alleged loan documentation and mortgage servicing records.

2.      **Defendant Select Portfolio Servicing, Inc. (SPS):** A mortgage servicing company with a principal address at 3217 S. Decker Lake Drive, Salt Lake City, UT 84119, involved in servicing the disputed mortgage on Plaintiffs' property during the relevant period. SPS has relied on inconsistent and unreliable documentation—including material discrepancies in the alleged Note and chain of title—to

assert an unauthorized claim over Plaintiffs' property. Despite years of repeated notifications from Plaintiffs regarding these critical defects, SPS has failed to investigate, correct, or acknowledge the impact of these issues, perpetuating a continuing cloud on Plaintiffs' property title.

3.   **Defendant U.S. Bank National Association:** A national banking association headquartered at Global Corporate Trust Services, Mailcode: EP-MN-WS3C, 60 Livingston Avenue, St. Paul, Minnesota 55107-2292, and as stated by Defendants in their Notice of Removal, with its principal place of business located at 425 Walnut Street, Cincinnati, Ohio 45202.

• **Individually:** U.S. Bank National Association is a national banking association that directly manages, oversees, and benefits from mortgage servicing and securitization practices involving Plaintiffs' alleged loan. U.S. Bank has participated in the administration and oversight of SPS's actions, including the reliance on inconsistent and unreliable documentation to assert unauthorized claims over Plaintiffs' property.

• **As Trustee:** U.S. Bank has asserted an interest in Plaintiffs' property through its role as trustee. Under its fiduciary obligations as trustee, U.S. Bank has a duty to ensure the validity, legality, and enforceability of all loan documents it relies upon in its capacity as trustee. Despite receiving notice of serious defects and documented misrepresentations in the claimed loan documentation (via SPS), U.S. Bank has failed to exercise due diligence or take reasonable steps to investigate, address, or rectify these material inconsistencies in the alleged Note and chain of title. This failure has directly contributed to the ongoing cloud on Plaintiffs' property title, in violation of its fiduciary responsibilities.

This page intentionally left blank

## JURISDICTION AND VENUE

4.     **Maine State Court Jurisdiction and Venue**: Plaintiffs acknowledge that this case is currently before the U.S. District Court for the District of Maine following Defendants' Notice of Removal. Plaintiffs maintain that jurisdiction properly lies with the Maine Superior Court, Oxford County, where this case was originally filed. Defendants' actions giving rise to this case occurred in Maine, and the property at the center of this dispute is located in Oxford County, Maine. Venue is therefore proper in the Maine Superior Court pursuant to **14 M.R.S. § 501**.

**I. Personal Jurisdiction:** Defendants are subject to personal jurisdiction in Maine under the Maine long-arm statute, **14 M.R.S. § 704-A**, because their actions directly relate to Plaintiffs' claims and satisfy constitutional due process. Specifically:

• Defendants purposefully availed themselves of the privilege of conducting business in Maine by:

**(a)** Servicing the alleged mortgage loan tied to Plaintiffs' Maine property;

**(b)** Filing and recording assignments and other documents in the Oxford County Registry of Deeds;

**(c)** Sending communications and conducting business with Plaintiffs at their Maine address; and

**(d)** Financially benefiting from the servicing and alleged ownership of a loan tied to real property in Maine.

• Plaintiffs' claims arise directly out of Defendants' actions in Maine.

**Diversity Jurisdiction**:

5.     For purposes of diversity jurisdiction, the citizenship of all trust beneficiaries must be considered. Given the wide geographic dispersion of beneficiaries in mortgage-backed securities trusts, it is highly likely that at least one resides in Maine, eliminating complete diversity. Defendants have failed to provide evidence to the contrary, and thus federal jurisdiction cannot be established.

# INTRODUCTION

This Verified Complaint addresses a documented series of misrepresentations and irregularities involving and stemming from the foreclosure action initiated by American Bank in October 2010 (Docket No. **RE-10-85**, filed in the South Paris District Court). The detailed timeline and evidence included herein are provided to support Plaintiffs' claims and to illustrate how Defendants' reliance on contradictory and unsubstantiated documentation has caused significant harm to Plaintiffs. This Complaint incorporates newly disclosed evidence received from SPS via mail on November 29, 2024—specifically, Note 7, which was enclosed in a letter dated November 18, 2024. Despite Plaintiffs' repeated requests to SPS over a span of seven years, as well as to prior servicers for years before that, this evidence was withheld for over a decade, despite numerous written inquiries. The delayed disclosure of these documents, now included as part of the evidence, highlights ongoing concerns about the transparency and accuracy of the records pertaining to the alleged loan. Moreover, the provided documentation reveals fatal deficiencies in Defendants' claims.

SPS explicitly stated in the November 18, 2024 letter that "under this heading you will find <u>everything that is in the collateral file.</u>" Despite this assertion, two key documents marked **"Allonge Sold"** were not provided, and the copies of the alleged Note and Allonges in the Collateral File lack any valid indorsement or assignment to U.S. Bank or any trust it manages. **(see Exhibits D2 and E)**

In May 2010, five months before the October 2010 foreclosure action, American Bank's then Senior Vice President, Mike Scully, provided representations regarding the authenticity of the promissory note. These representations became part of the documentation and records later used in actions involving the purported mortgage loan and note. Plaintiffs contend that discrepancies and irregularities in the chain of title and supporting documentation remain unresolved, contributing to the claims set forth in this Complaint.

**Anticipated Defenses and Context for Claims**

6.      Defendants may argue that Plaintiffs' requests for clarification, validation, and documentation are 'overbroad,' 'unduly burdensome,' or beyond the scope of mortgage servicing. However, Plaintiffs contend that the issues raised are central to determining the legitimacy of Defendants' claims and authority to enforce the alleged debt. The documents in question, including Notes 2, 4, and 7, bear directly on the debt's authenticity, the chain of title's validity, and Defendants' standing. These are not peripheral issues but core to this case.

7.      Furthermore, Plaintiffs allege that Defendants, by introducing and relying on documents with significant discrepancies—including indorsements and allonges that conflict with the recorded chain of assignments—have perpetuated questionable practices initiated by prior servicers. These unresolved inconsistencies raise serious questions about the accuracy and authenticity of the documentation and have created uncertainty regarding the status and integrity of Plaintiffs' property title. Defendants' actions underscore the urgent need for judicial scrutiny to protect Plaintiffs' rights and ensure the integrity of the judicial process.

**Dispute of Debt and Loan Validity**

Plaintiffs dispute the validity of the alleged debt due to documented inconsistencies and irregularities in critical loan documents, including indorsements, allonges, and recorded assignments.

**Specifically, these issues include:**

• **Breaks in the Chain of Title:** Apparent gaps in the recorded chain of title undermine the legitimacy of Defendants' claims.

• **Conflicting Indorsements:** Discrepancies in indorsements and allonges raise significant questions about the authenticity and transfer history of the alleged loan.

• **Fabricated or Missing Assignments:** Plaintiffs have identified fabricated or omitted entries in recorded assignments, which have directly contributed to the clouding of Plaintiffs' property title.

• **Introduction of Conflicting Documentation:** Notably, Defendants introduced Note 7 (**Exhibit D2**) years after litigation began. This document includes indorsements that conflict with prior representations and do not align with the alleged loan's documented history or assignments recorded in the Oxford County Registry of Deeds.

8.      Furthermore, Note 7 lacks any valid indorsement or assignment to U.S. Bank or any trust it manages, further undermining Defendants' standing to enforce the alleged debt.

These irregularities collectively call into question the validity of the alleged debt and Defendants' claims of authority to enforce it.

**Purpose of this Complaint**

This Verified Complaint seeks to hold Defendants accountable for actions that Plaintiffs allege caused significant harm. Plaintiffs will present documentary evidence, including the recently disclosed Note 7 (**Exhibit D2**), obtained from Defendants and their predecessors. This evidence, detailed in Counts 1 through 12, highlights discrepancies in indorsements, alonges, and recorded assignments— such as the <u>2022 Quit Claim Assignment from Taylor, Bean & Whitaker</u>—and alleges that Defendants perpetuated questionable practices initiated by prior servicers by relying on conflicting documents and failing to take corrective action when notified.

9.      The Complaint seeks relief under multiple causes of action, including but not limited to:

• **Violations of State Consumer Protection Laws:**

• Violations of Maine's Unfair Trade Practices Act (**UTPA) (5 M.R.S.A. § 207)**.

•  **Fraud-Based  Claims:**

  • Fraudulent Misrepresentation;

  • Fraud on the Court;

  • Fraudulent Foreclosure Action;

  • Filing  of  False  Documents

• Bad Faith and Deceptive Practices;

• Breach of Fiduciary Duty.

• **Property and Contractual Claims:**

• Clouding of Title;

• Contract Fraud;

• Unjust Enrichment.

• **Other Claims:**

• Fraudulent and Deceptive Trade Practices, brought under **5 M.R.S.A. § 207** (Maine Unfair Trade Practices Act) and Maine common-law fraud.

• Infliction of Emotional Distress and Physical Harm.

10.     Plaintiffs request the Court to hold Defendants accountable for these violations, rectify the harm caused, and deter future misconduct through appropriate legal and equitable remedies.


## FACTUAL BACKGROUND

**The May 2010 "True and Accurate" Note Verification: Introduction of Note 1**

11.     On May 12, 2010, Mike Scully, Senior Vice President of American Bank, issued a letter to Plaintiffs certifying that the attached document, referred to herein as Note 1, was a "<u>true copy of the original</u>" promissory note allegedly associated with Plaintiffs' property (**Exhibit H: Scully Letter, Statement #1, page 1**).

12.     This representation was made in response to a Qualified Written Request (QWR) submitted by Plaintiffs and included a blank indorsement on the alleged Note by the originally named lender, Taylor, Bean & Whitaker (TBW).

13.     Despite American Bank's claim to hold the alleged original note, Plaintiffs were denied access to inspect it. In a letter dated July 1, 2010, American Bank declined Plaintiffs' request to verify

the document in person, despite Plaintiffs' willingness to travel to the bank's Maryland office (**Exhibit H2, paragraph 3**).

14. This assertion by American Bank established a documented standard for what was represented as the 'original' note in Plaintiffs' purported mortgage file at that time.

**The Foreclosure Action and Introduction of Note 2**

15. In October 2010, American Bank, through its attorneys Bendett and McHugh, initiated a foreclosure action against Plaintiffs in the South Paris District Court. As evidence of standing, they submitted Note 1 under oath, confirming it as the "<u>true and accurate copy</u>" of the note. (**Exhibit A**)

16. During the discovery proceedings, on or around March 31, 2011, American Bank, through its attorneys Bendett and McHugh, introduced a different version of the note, into the South Paris District Court, referred to as Note 2, in a sworn Discovery filing (**Exhibit B**).

17. Note 2 included a <u>special indorsement</u> from TBW directly to American Bank, purportedly signed by Erla Carter-Shaw.

18. The alleged indorsement from Taylor, Bean & Whitaker (TBW) to American Bank was executed at a time when TBW had already ceased operations following a federal raid and bankruptcy filing. Furthermore, the individual purportedly signing the indorsement, Erla Carter-Shaw, had left TBW nearly a year earlier, in <u>February 2010</u>. (**See Exhibit G: Erla Carter-Shaw's LinkedIn biography, which confirms her departure from TBW in February 2010.**)

19. Additionally, Plaintiffs had been notified in April 2009 that TBW had transferred ownership of the alleged loan to **MCMCAP Homeowners' Advantage Trust IV**, as reflected in the actual chain of assignments recorded in the Oxford County Registry of Deeds (**Exhibits F3 and K5.1**). The special indorsement from TBW, directly to American Bank on Note 2 is inconsistent with recorded history.

**Emergence of Notes 3 and 4**

20.     During the foreclosure action, the alleged loan was assigned to Goshen Mortgage, LLC (**Goshen**) on March 16, 2012. (**Exhibit K5**).

21.     At that time, Goshen was identified as the <u>owner</u> of the alleged loan in a substitution of plaintiff motion filed by American Bank through their attorneys, Bendett and McHugh.

22.     After Goshen assumed control of the foreclosure proceedings (**Exhibit K6, Judicial Order granting Goshen Mortgage, LLC's substitution**), additional versions of the promissory note —identified as Notes 3 and 4—were introduced.

23.     Note 3, now featuring a blank indorsement on both the alleged Note and Allonge, was provided in response to a Qualified Written Request (QWR) dated December 8, 2011, which also identified Goshen Mortgage, LLC as the "owner" of the alleged loan. (**Exhibit C**)

24.     Additionally, Note 4, reverting to a special indorsement, was submitted under oath by Bendett and McHugh on behalf of Goshen in August 2012 as part of an Amended Witness and Exhibit List. (**Exhibit D**)

25.     Note 4 also included an allonge indorsed in blank by Mike Scully, who was then the Senior Vice President of American Bank.

26.     Note 4 was the operative note utilized by AMS Servicing, LLC, and Goshen Mortgage, LLC, during the alleged 2012 loan modification to establish standing.

27.     The Definitions section of the 2012 Modification Agreement (**Exhibit L4**) defines the term 'Note' as including 'the original note and any renewals, extensions, modifications, and loan adjustments.' At that time, the most recently referenced version in court was Note 4, submitted under oath by AMS Servicing on behalf of Goshen through their attorneys, Bendett and McHugh, PC.

28.     The purported 2012 Modification Agreement defines the "Note" in a manner that requires the production of Note 4—the version explicitly referenced in court filings, bearing the TBW

special indorsement, and utilized during the modification process.

29.    The indorsements on Note 4, submitted under oath, remain the focal point of authenticity concerns, as it forms the basis for the alleged chain of title and for establishing standing to execute the alleged Loan Modification at that time.

30.    Note 4 disappeared from the record after 2012 and did not reappear until November 2024, when it resurfaced with three additional allonges as the document now referred to as <u>Note 7</u>. (**Exhibit D2**)

31.    Between 2017 and 2023, SPS transmitted at least eight mailings, each containing copies of Note 1. (**Exhibit A**)

32.    These mailings including copies of Note 1 consistently misrepresented the true nature of the alleged original note, forming the basis for SPS and U.S. Bank's claims of standing and their asserted rights to collect and enforce the alleged loan.

**Alleged Perpetuation of Fraud and Misrepresentation**

33.    While SPS and U.S. Bank were not directly involved in the initial 2010 foreclosure proceedings, Plaintiffs allege that they knowingly relied upon and utilized documents containing material discrepancies, including promissory notes and indorsements that Plaintiffs assert were inauthentic or irregular. These documents, previously submitted under oath in court, are alleged to have served as the basis for Defendants' subsequent claims and actions.

34.    Despite receiving multiple notifications and evidence highlighting significant discrepancies in the documentation, SPS and U.S. Bank are alleged to have failed to take appropriate corrective action or amend the record in a manner consistent with their obligations.

35.    Rather than addressing the disputed documents, SPS and U.S. Bank are alleged to have continued relying on them to assert claims of standing related to the foreclosure, loan modification, and subsequent collection efforts, as <u>demonstrated by the abrupt disclosure of Note 7 in November 2024</u>.

36. Plaintiffs contend that this ongoing pattern of reliance on inconsistent documentation, even after the discrepancies were brought to light, constitutes a breach of trust and accountability.

37. Plaintiffs further allege that SPS and U.S. Bank's continued use of these documents not only aligns them with prior questionable acts but also highlights their active role in perpetuating the issues surrounding the alleged loan and its associated documentation.

38. Plaintiffs allege that Defendants' actions reflect a disregard for legal standards and an intent to obscure material facts, thereby exacerbating their liability by perpetuating misrepresentations and directly contributing to Plaintiffs' damages.

**Newly Discovered Evidence of Note Discrepancies**

39. In October 2024, <u>newly uncovered evidence</u> regarding Erla Carter-Shaw's employment timeline provided further substantiation of discrepancies in the indorsements on Notes 2 and 4. Specifically, her departure from TBW in February 2010 predates the alleged execution of these indorsements by nearly a year (**Exhibit G**).

40. Plaintiffs allege that Defendants' reliance on multiple, conflicting versions of the promissory note—including at least seven variations over time, such as Note 1 with a single blank indorsement relied upon between 2017 and 2023—was intended to obscure the true ownership and enforceability of the alleged loan, thereby contributing to confusion and harm to Plaintiffs.

41. The existence of conflicting versions of the promissory note, compounded by material discrepancies in indorsements and alloges, has perpetuated uncertainty regarding the alleged loan's validity and ownership, significantly impairing Plaintiffs' ability to resolve the dispute and protect their property rights.

42. Plaintiffs have informed Defendants of the discrepancies surrounding the existence of multiple Notes for many years and to date Defendants have failed to address or correct these issues.

**Introduction of Note 7**

43.    In November 2024, SPS introduced Note 7, a version of the note containing indorsements and allonges not present in earlier versions.

44.    Notably, Note 7 contains a special indorsement directly from American Bank to Bayview Loan Servicing, LLC, which is conspicuously absent from the recorded assignment chain, raising significant concerns about the authenticity and validity of the allegd loan's chain of title **(Exhibit F)**.

45.    The Special indorsement on the Allonge from American Bank directly to Bayview Loan Servicing, LLC, <u>predates Bayview's documented entry into the chain by nearly three years</u>.

46.    Additionally, Note 7 features an indorsement from Taylor, Bean & Whitaker (**TBW**) directly to American Bank, which again raises significant concerns. The authenticity and timing of this indorsement is also questionable, as it was allegedly executed after TBW's shutdown in 2009 and the 2010 departure of Erla Carter-Shaw, its Executive Vice President.

47.    The indorsements attributed to TBW's E.V.P., Erla Carter-Shaw, appearing on Notes 2, 4, and 7, exhibit machine-precise replication—a feature that raises serious questions about their authenticity. Significantly, these indorsements were allegedly executed four years apart, with one allegedly executed nearly a year after her documented departure from TBW in February 2010, further undermining their credibility and legitimacy.

48.    These discrepancies raise grave concerns regarding the authenticity and validity of both indorsements, undermining the credibility of Defendants' claims of ownership and enforceability.

49.    The introduction of Note 7—over a decade after the foreclosure action and following Plaintiffs' Certified Written Requests, which prompted at least eight mailings of Note 1 by SPS from 2013 to 2017—raises serious questions about its authenticity, its role in addressing deficiencies in the chain of title, and Defendants' concealment of material facts critical to this case.

50.     Despite Plaintiffs' repeated Certified Written Requests over more than seven years—including at least eight mailings of Note 1 by SPS—Defendants have only now, in November 2024, introduced Note 7. This delayed disclosure raises critical questions about its authenticity, its purpose in addressing deficiencies in the chain of title, and Defendants' intent in withholding it until this late stage.

51.     This delayed discovery is critical for tolling the statute of limitations under Maine law, as Defendants' failure to disclose material documents prevented Plaintiffs from uncovering essential facts regarding the note's authenticity and chain of title.

**Newly Discovered Evidence Regarding the Purported AMS Servicing Modification Agreement:**

52.     In October 2024, a detailed examination of alleged Loan Modification Agreement uncovered critical new information regarding the identification of **GDBT I Trust 2011-1**.

53.     The 2012 Loan Modification Agreement identified GDBT I Trust 2011-1 as the owner of the alleged loan. (**Exhibit L4**)

54.     Despite this claim, no recorded assignment or documentation in the Oxford County Registry of Deeds, or on the alleged Original Wet-Ink Note establishes any connection between GDBT I Trust 2011-1 and Plaintiffs' alleged loan. (**Exhibit K5**).

55.     Goshen Mortgage, LLC, officially named as "owner" in the foreclosure action substitution **(Exhibit K6)** and QWR response **(Exhibit C)**, was purported to be the last recorded owner of the alleged loan at that time and is not referenced in the alleged modification agreement.

56.     The alleged Loan Modification Agreement explicitly states that it would "take effect only if signed by AMS, as servicer for the owner."

57.     However, GDBT I Trust 2011-1, designated as the "owner" in the agreement, does not appear in any recorded assignment within the Oxford County Registry of Deeds, or on the note leaving its claim to ownership unsupported.

58.     Plaintiffs allege that the agreement was executed without proper authority, rendering it invalid.

**Enforceability Issues Due to Ambiguities in Governing Law:**

59.     The alleged Loan Modification Agreement omits any reference to governing law applicable to its interpretation, creating significant ambiguity regarding its enforceability. Moreover, the inclusion of a release clause referencing **California Civil Code § 1542**—despite no connection to California by any legally authorized party to the Agreement—further undermines its reliability and raises questions about its legitimacy.

**Medical Evidence Linking Defendants' Actions to Health Impacts:**

60.     Plaintiffs allege that the prolonged legal battles during the foreclosure and the uncertainty caused by conflicting documentation have significantly impacted their physical and mental health, particularly G. Paul Taitt. Medical records substantiate a diagnosis of Generalized Anxiety Disorder underlined directly linked to the foreclosure action initiated in 2010 (**Exhibit M**).

61.     Plaintiffs further contend that these significant health impacts highlight the extent of the damages resulting from Defendants' actions, including their reliance on inconsistent and fabricated documentation.

**Additional Harassment and Misleading Communications**

62.     Between November 11 and 13, 2024, SPS and U.S. Bank sent at least 16 separate letters to Plaintiffs, including collection notices, foreclosure-related correspondence, and a $40 check purporting to refund "certain fees" (**Exhibit H3**).

63.     These communications, issued after a formal Cease and Desist letter, were contradictory and misleading, creating confusion about the alleged debt and inducing undue stress on Plaintiffs.

64.     Plaintiffs allege that Defendants' repeated and contradictory communications were intended to harass and pressure them into compliance with a disputed debt.

65.     Plaintiffs allege that the simultaneous issuance of contradictory letters, combined with the sudden introduction of new versions of the alleged note, underscores Defendants' disregard for Plaintiffs' rights and evidences a deliberate pattern of bad faith and deceptive practices designed to confuse and coerce Plaintiffs into compliance.

66.     Despite a formal Cease and Desist letter sent to SPS in October 2024 (**Exhibit H4**), Defendants escalated collection activities, including sending new versions of the note (**Exhibit D2**).

**Ongoing Discrepancies and Harm to Plaintiffs**

67.     Defendants have failed to produce the original wet-ink promissory note, a physical document containing the original, unaltered signature of all required parties, despite Plaintiffs' repeated requests spanning more than seven years.

68.     This refusal persists despite Defendants' claims of possession, and their failure to produce this critical document underscores unresolved issues in the note's chain of title and authenticity.

69.     While Defendants have claimed that the original note is available for inspection at their Utah facility, they have consistently refused to provide verified copies in response to Plaintiffs' certified written requests.

70.     Over the years, Defendants have mailed at least eight representations of the alleged note to Plaintiffs, yet only introduced Note 7 for the first time in November 2024—more than a decade after the foreclosure proceedings began.

71.     Note 7, now presented as the operative instrument, is a **specially indorsed instrument** containing a previously undisclosed indorsement from American Bank directly to Bayview Loan Servicing, LLC.

72.     This indorsement, purportedly executed nearly three years before Bayview's involvement in the alleged loan's chain of title, is legally inconsistent with the documented transfer

history and raises significant questions about its authenticity.

73. Furthermore, as a "special indorsement," it purports to name a specific party as the transferee but lacks corroborating documentation in the chain of title, rendering it legally insufficient to transfer ownership.

74. Despite Plaintiffs' repeated certified correspondence—including as recently as October 2024—Defendants have failed to acknowledge or address the existence of Note 2 in writing.

75. Note 2, which includes a special indorsement from TBW to American Bank, was introduced during prior litigation but has been omitted from Defendants' subsequent representations. Note 7, which derives directly from Note 2, was only disclosed in November 2024.

76. Plaintiffs assert that the delayed introduction of Note 7 in November 2024, combined with the continued nondisclosure of Note 2, constitutes fraudulent concealment, which tolls the statute of limitations. Despite Plaintiffs' repeated Certified Written Requests to SPS since 2017, as well as to prior servicers in earlier years, Defendants failed to disclose these critical documents. This deliberate omission impeded Plaintiffs from uncovering material discrepancies in the loan documentation, thereby preventing them from pursuing their claims within the standard limitations period.

77. Plaintiffs allege these omissions, contradictions, and the introduction of multiple versions of the alleged note underscore material defects in Defendants' standing and authority to enforce the alleged debt.

78. Defendants' reliance on fabricated, inconsistent, and incomplete documentation—including their refusal to produce the original wet-ink promissory note and their ongoing use of conflicting indorsements, allonges, and assignments—combined with their deliberate concealment of material facts, has directly clouded the title to Plaintiffs' property, diminished its market value, and caused Plaintiffs significant financial, physical, and emotional harm.

79. This conduct reflects a broader pattern of fraudulent misrepresentation, deceptive

practices, and systemic efforts to evade accountability, obstruct Plaintiffs' rights, and perpetuate ongoing harm.

80.     The presentation of multiple versions of the alleged note, compounded by the absence of any indorsement on Note 7 to U.S. Bank or any trust it manages, necessitates production of the original wet-ink promissory note. Without such a note explicitly and legally connecting U.S. Bank or its managed trust to the chain of title, Defendants cannot establish standing to enforce the alleged debt, rendering their claims invalid.

81.     The resulting uncertainty and clouded title have deprived Plaintiffs of their full property rights, including the ability to sell, or otherwise enjoy their property free from legal encumbrances. Plaintiffs respectfully request that this Court compel Defendants to produce the original wet-ink promissory note. Defendants' continued reliance on inconsistent and fabricated documentation underscores a deliberate and systemic effort to obscure material facts, defraud Plaintiffs, and evade accountability. Without the production of the original note, Defendants' claims must be deemed legally insufficient, reinforcing Plaintiffs' entitlement to equitable relief and the full restoration of their property title and rights.

**Allonge Sold Documents Reveal Critical Flaws in Chain of Title and Ownership Claims**

82.     Plaintiffs have recently uncovered critical evidence revealing fundamental defects in the chain of title for the alleged mortgage loan and note. Specifically, Bayview Loans executed a "Without Recourse" transfer of the note and accompanying mortgage (as the mortgage follows the note) to Bayview Dispositions, which subsequently executed "Without Recourse" transfers of the note to Chimera Funding in February and March of 2017, thereby relinquishing all rights to the alleged loan. (See Allonges with Note 7, **Exhibit D2.**)

83.     Despite these February and March 2017 note transfers, both entities subsequently executed and recorded mortgage assignments on the same day in July 2017, asserting ownership rights

that had already been waived. These assignments were executed and recorded during a period when SPS and U.S. Bank had assumed servicing responsibilities and claimed ownership of the alleged loan.

84.     This discovery was only made possible through the Plaintiffs' close examination of the Allonge Sold documents omitted from the collateral file provided by Defendants in November 2024, alongside Note 7. (**See Exhibit E**, Allonge Sold Documents with Note 5, which clearly displays the note and mortgage assignment dates.) These documents revealed glaring inconsistencies in the chain of title.

85.     The timing and nature of the July 2017 assignments not only contradict the established chain of title but also irreparably cloud Plaintiffs' title. Moreover, these actions demonstrate a misrepresentation to the Oxford County Registry of Deeds and undermine Defendants' current claims of ownership and enforceability. The deliberate failure to disclose these material facts has significantly harmed Plaintiffs by perpetuating uncertainty and obstructing their ability to protect their rights.

This page intentionally left blank

<h1 style="text-align:center">COUNT  1</h1>

<h2 style="text-align:center">Fraudulent Misrepresentation</h2>

<h3 style="text-align:center">(as to SPS and U.S. Bank)</h3>

86.    Plaintiffs incorporate all previous paragraphs herein by reference.

**Overview of Fraudulent Misrepresentation**

87.    This Count arises under Maine common law prohibiting fraudulent misrepresentation. Defendants, SPS and U.S. Bank, engaged in deliberate and material misrepresentations regarding the legitimacy of the promissory notes and loan modifications. These misrepresentations were designed to induce reliance by Plaintiffs and the court, allowing Defendants to unlawfully collect payments and enforce rights to which they were not entitled.

**Fraudulent  Representations:**

**Multiple Versions of the Promissory Note**

88.    Defendants presented and relied upon multiple versions of the promissory note—specifically Notes 1, 2, 4 and 7—each containing conflicting and fabricated indorsements, as detailed in **Exhibits A, B, C, D, D2, E, and F**.

89.    These documents included indorsements purporting to be signed by Erla Carter-Shaw after her departure from Taylor Bean & Whitaker (TBW) in February 2010, **(Exhibit G)** with TBW ceasing operations entirely in 2009. In addition, identical, machine-precise signatures appearing on indorsements allegedly created years apart demonstrate forgery.  **(see Note 7, Exhibit D2)**

90.    Despite these discrepancies, Defendants adopted these notes, including using Note 1 as the definitive version up to 2023 **(Exhibit L)**, while failing to address or explain the inconsistencies in Notes 2 and 4, both of which had been submitted in prior litigation and chain-of-title records **(Exhibits  B  and  D)**.

**Fraudulent indorsements and Impossibilities**

91.     Defendants presented indorsements and assignments that could not have been executed as claimed, undermining their legitimacy:

**(a).** In May 2010, Mike Scully of American Bank confirmed that Note 1, indorsed in blank, was a "true copy" of the original promissory note in existence prior to and during the commencement of foreclosure proceedings. This confirmation was further corroborated <u>under oath</u> by American Bank's attorneys, Bendett and McHugh, attesting to the authenticity of Note 1 **(Exhibit H).**

**(b).** The subsequent appearance of Note 2 **(Exhibit B)** during discovery on or around March 31, 2011, bearing a fabricated special indorsement from TBW directly to American Bank, demonstrates a deliberate effort to misrepresent the authenticity and chain of title of the promissory note.

**(c).** The June 1, 2009 assignment from Taylor, Bean & Whitaker (TBW) to MCMCAP Homeowners Advantage Trust IV, recorded in the Oxford County Registry **(Exhibit K5.1)**, establishes that TBW had no direct connection with American Bank. Subsequently, the recorded June 1, 2009 assignment from MCMCAP Homeowners Advantage Trust IV to American Bank **(Exhibit K5.2)** invalidates any claim to later indorsements by TBW. These records demonstrate the impossibility of the indorsement on Note 2, as <u>TBW never directly assigned the alleged loan to American Bank</u>.

**Fraudulent Representations: Multiple Versions of the Promissory Note**

92.     On November 18, 2024, SPS introduced a seventh version of the promissory note, designated as "Note 7" **(Exhibit D2)**. The emergence of Note 7 highlights a recurring pattern in Defendants' behavior, wherein fabricated versions of the promissory note were introduced at strategic intervals to obscure material deficiencies in the chain of title and create an illusion of enforceability. This note included a previously undisclosed special indorsement on an allonge from American Bank to Bayview Loan Servicing, LLC, which directly contradicts the recorded chain of assignments in the Oxford County Registry. The introduction of Note 7 represents a blatant fabrication designed to

obscure the true ownership of the alleged loan.

93.     Note 7's special indorsements are legally and factually impossible for the following reasons:

**(a).** TBW assigned the alleged loan to MCMCAP Homeowners Advantage Trust IV on June 1, 2009, precluding any direct assignment to American Bank (**Exhibit K5**);

**(b).** Erla Carter-Shaw, who purportedly signed the indorsements, left TBW in February 2010, a year before the indorsements were allegedly executed (**Exhibit G**). TBW ceased operations following its 2009 federal raid and bankruptcy; and

**(c).** The special indorsement from American Bank to Bayview Loan Servicing, LLC defies chronology and logic. American Bank assigned the alleged loan to Goshen Mortgage, LLC in March 2012, and Bayview did not appear in the chain of assignments until January 8, 2015. No recorded assignment supports this purported transfer (**Exhibit K5**).

The inclusion of Note 7's special indorsements not only contradicts prior versions but introduces new discrepancies that obliterate any continuity in the chain of title, further eroding Defendants' standing.

94.     The introduction of Note 7 creates an irreconcilable contradiction within the documented chain of title. It obliterates the purported chain of ownership and exposes a deliberate scheme to fabricate indorsements to mislead Plaintiffs and the court. This newly disclosed evidence tolls the statute of limitations under **14 M.R.S. § 859**, as it reveals material facts previously concealed by Defendants and substantiates Plaintiffs' claims of fraudulent misrepresentation and lack of standing.

95.     The introduction of Note 7 on November 18, 2024, represents the most egregious act of fraudulent misrepresentation. Its fabricated indorsements include:

**(1).** A special indorsement from TBW to American Bank, despite TBW's closure and prior assignment to MCMCAP in 2009;

**(2).** An indorsement allegedly signed by Erla Carter-Shaw, despite her departure from TBW in

February 2010; and

**(3).** A direct special indorsement from American Bank to Bayview Loan Servicing, LLC, predating Bayview's documented entry into the chain of title by nearly 3 years.

96.     The introduction of Note 7 (**Exhibit D2**) further exposes deliberate material alterations under Maine's Uniform Commercial Code (**UCC § 3-407**), which defines material alterations as rendering negotiable instruments unenforceable. The purported special indorsements from Taylor Bean & Whitaker to American Bank and from American Bank to Bayview Loan Servicing, LLC constitute fabricated and impossible transactions. Taylor Bean's closure in 2009 precludes any valid special indorsement post-2009, and American Bank's alleged assignment of the loan to Goshen Mortgage LLC in January 2011 further nullifies any subsequent transfer from American Bank to Bayview, as Bayview Loan Servicing, LLC did not enter the chain of title until 2015, making the indorsements legally and factually impossible. These fraudulent alterations, compounded by missing assignments and gaps in the chain of title, render Note 7 invalid and unenforceable under Maine law.

97.     These fabrications conclusively sever the chain of title and standing, rendering Defendants' claims legally baseless. The introduction of Note 7 reveals a calculated effort to obscure material discrepancies and maintain a fraudulent claim of ownership and enforceability over the alleged loan. Defendants' reliance on these fabricated indorsements demonstrates an intentional scheme to mislead Plaintiffs and assert false authority, further substantiating their liability under Maine law.

**Deception to Induce Payments**

98.     An SPS representative falsely claimed to hold the original note during a recorded phone call (**Exhibit J, Call 4**). This false assertion was made with the intent to induce Plaintiffs to act to their financial detriment, directly causing Plaintiffs to remit a payment of **$1,634.87** under fraudulent pretenses. This payment was made in reliance on SPS's misrepresentation, and Plaintiffs suffered financial harm as a result.

**Fraudulent Loan Modification and Concealment of True Parties**

99.     In 2012, Plaintiffs entered into an alleged loan modification agreement under the belief that AMS Servicing, acting on behalf of Goshen Mortgage, LLC, had lawful authority to do so. However, Defendants deliberately concealed the involvement of GDBT 1 Trust 2011-1, the true party in interest, which was never disclosed to Plaintiffs during the modification process (**Exhibit L4**). This misrepresentation induced Plaintiffs to enter into a loan modification agreement that increased their financial obligations under false pretenses, causing financial harm and emotional distress as Plaintiffs unknowingly engaged in a transaction based on fabricated documents.

100.    The validity of the modification was predicated on **Note 4**, which contained fabricated indorsements **(Exhibit D)** and was entered into court <u>under oath</u>. By relying on falsified documentation, Defendants misrepresented the legitimacy of the transaction and induced Plaintiffs to execute a modification agreement under false pretenses.

101.    Plaintiffs discovered the involvement of GDBT 1 Trust 2011-1 in October 2024, over a decade after the modification agreement was executed. This concealment of material facts demonstrates Defendants' intent to defraud and perpetuate a scheme designed to obscure the true chain of title and ownership.

102.    The introduction of Note 7 further invalidates the 2012 Loan Modification Agreement by exposing deliberate efforts to fabricate and conceal the chain of title. By erasing Goshen Mortgage, LLC (Goshen) from the chain and inserting a fabricated special indorsement from American Bank to Bayview Loan Servicing, LLC, Defendants severed any legitimate connection to recorded assignments in the Oxford County Registry. No recorded assignment establishes that GDBT 1 Trust 2011-1 had a valid legal claim to the alleged loan at the time of the modification. This absence invalidates any authority to enforce the purported loan or modification agreement. The Loan Modification Agreement, predicated on Note 4 and involving entities now removed from the chain of title, is **void ab initio** under

the legal maxim "**fraud vitiates all contracts**." The fraudulent nature of Defendants' conduct nullifies the agreement and any rights claimed under it, underscoring Defendants' lack of standing to enforce claims based on the note or modification agreement.

103.   The concealment extended to the securitization of the alleged loan, as Defendants failed to disclose the involvement of GDBT 1 Trust 2011-1 during the modification process. Plaintiffs reasonably believed that AMS Servicing, acting on behalf of Goshen, was the true party in interest. However, the securitization structure, which placed the alleged loan within GDBT 1 Trust 2011-1, was deliberately concealed. This omission misled Plaintiffs regarding the true counter-party to the alleged modification, preventing them from understanding the full scope of the transaction and the entities involved in enforcing the purported loan. By concealing this material fact, Defendants perpetuated a fraud designed to obscure the chain of title and their lack of legal authority at the time of the modification.

**Knowledge and Intent to Deceive**

104.   Defendants had actual knowledge of the falsity of the documents they relied upon or acted with reckless disregard for the truth:

**(a)**. SPS representatives admitted to discrepancies during recorded calls, stating, "I don't know which one was originally stamped in" **(Exhibit J, Call 3)**.

**(b).** Plaintiffs provided formal notice of discrepancies through certified letters over several years **(Exhibit L3)**, yet Defendants refused to correct the record or acknowledge the discrepancies.

**(c)**. Defendants knowingly perpetuated the use of fraudulent documents to unjustly enrich themselves through unwarranted payments and enforcement actions.

105.   Defendants' reliance on Note 7 in 2024 demonstrates a continued pattern of misrepresentation and bad faith. By introducing a version of the note from their Collateral file in November 2024 that not only contradicts prior submissions but appears to fabricate indorsements

intended to bridge critical gaps in the chain of title, Defendants have revealed a clear and deliberate intent to deceive Plaintiffs. This conduct mirrors earlier fraudulent actions, including the introduction of Notes 2 and 4 during the 2010–2012 foreclosure proceedings, both of which were used to misrepresent ownership and enforceability. These deliberate and calculated actions underscore Defendants' ongoing effort to perpetuate a fraudulent scheme, evade accountability, and mislead both Plaintiffs and the Court.

106.     Defendants knowingly used fraudulent documents to induce reliance by Plaintiffs and the court, securing payments and enforcement rights to which they were not lawfully entitled.

**Justifiable Reliance and Resulting Harm**

107.     Plaintiffs and the court justifiably relied on Defendants' representations, as Defendants, through their roles as financial institutions and servicers, held themselves out as possessing legitimate authority and accurate documentation. Plaintiffs, as laypersons without access to the original documents or expertise in financial instruments, had no reason to doubt the veracity of Defendants' claims. This reliance resulted in financial harm, emotional distress, and documented physical health issues (**Exhibits M and M2**).

108.     The misrepresentations caused Plaintiffs significant harm, including monetary losses, litigation expenses, emotional distress, and physical health impacts resulting from prolonged stress **(Exhibits M and M2).**

**Pattern of Evasion and Concealment**

109.     Despite being formally notified of discrepancies, Defendants repeatedly refused to address or correct the record. Their ongoing reliance on fraudulent documents evidences a deliberate strategy to obscure their lack of standing and perpetuate the fraudulent scheme.

110.     Defendants' continued reliance on fraudulent promissory notes and fabricated indorsements demonstrates a sustained effort to financially benefit from their misrepresentations.

Each submission of these documents—whether to the court or in correspondence with Plaintiffs—allowed Defendants to enforce rights to which they were not lawfully entitled, including collecting payments, threatening foreclosure, and inducing modifications under false pretenses. Despite being notified of the discrepancies, **(Exhibit L3)** Defendants refused to correct the record, relying on a strategy of evasion and concealment **(See Exhibits L, D and D2)** to maintain their claims of standing. This deliberate and ongoing conduct underscores Defendants' bad faith and intent to defraud Plaintiffs for financial gain.

111.    The deliberate inclusion of these indorsements on Note 7 reveals Defendants' willful intent to deceive, obscure material facts, and perpetuate a fraudulent scheme to enforce an illegitimate debt. The original wet-ink promissory note is now demanded as a matter of necessity under Maine law to resolve title disputes and enforceability issues. Plaintiffs specifically demand the immediate production of the original wet-ink promissory note, unaltered and in its entirety, bearing a legitimate chain of indorsements backed by recorded evidence, including a direct special indorsement to U.S. Bank or any trust it manages, for authentication. This demand directly addresses the Defendants' claims of standing and authority. Defendants' failure or refusal to produce this critical document will conclusively establish that the note either does not exist, has been irreparably altered, or has never been in the possession of U.S. Bank or any of its trusts. Such a failure will further validate all of Plaintiffs' claims in this Verified Complaint, including lack of standing, systemic fraud, and deliberate misrepresentation. Any reliance on a "lost note" affidavit or other substitute documentation will only reinforce the systemic fraud perpetrated by Defendants, underscoring the need for judicial intervention and punitive sanctions.

112.    Plaintiffs have recently uncovered evidence demonstrating a systematic effort to obscure the true chain of title to the alleged mortgage loan and note. Specifically, Bayview Loans and Bayview Dispositions executed "Without Recourse" transfers of the note and accompanying mortgage to

Chimera Funding in February and March of 2017, relinquishing all rights to the loan and mortgage at that time. (See Allonges with Note 7, **Exhibit D2**).

113.    Despite these transfers, Bayview Loans and Bayview Dispositions subsequently executed and recorded mortgage assignments in July 2017, falsely asserting ownership rights that had been waived months earlier. These assignments were executed and recorded during a period when SPS and U.S. Bank had assumed servicing and claimed ownership of the alleged loan, creating an irreconcilable conflict in the chain of title.

114.    This discovery was made possible only through Plaintiffs' review of the 'Allonge Sold' documents provided by Defendants in 2022 (**See Exhibit E**, Allonge Sold Documents with Note 5). Defendants' omission of these critical documents from the collateral file sent to Plaintiffs in November 2024 underscores a deliberate effort to conceal material information essential to Plaintiffs' claims.

115.    By knowingly relying on these invalid assignments to support their claims of ownership, Defendants perpetuated misrepresentations that formed the basis for their actions against Plaintiffs. These misrepresentations irreparably clouded Plaintiffs' title, obstructed their ability to protect their rights, and caused significant emotional and financial harm.

### Legal Precedents Supporting Fraudulent Misrepresentation Claims

116.    Under Maine law, fraud vitiates any contract or judgment it affects. In ***Bradbury v. GMAC Mortgage, LLC, 780 F. Supp. 2d 108 (D. Me. 2011)***, the court addressed the submission of fraudulent affidavits in foreclosure proceedings and emphasized that fraud upon the court justifies vacating judgments and imposing appropriate sanctions. Similarly, in ***Merrill v. Merrill***, **449 A.2d 1120 (Me. 1982)**, the Maine Supreme Judicial Court affirmed that equity provides relief from judgments obtained through fraudulent means, emphasizing that fraud undermines the integrity of legal proceedings. Fraudulent concealment also serves as a well-established basis for tolling statutes of limitations. In ***Greene v. Merrill, 434 A.2d 1069 (Me. 1981)***, the court held that intentional acts of

concealment toll statutory deadlines when such acts prevent a party from discovering their cause of action. These cases collectively support Plaintiffs' claims of fraudulent misrepresentation and justify equitable remedies for Defendants' alleged fraudulent conduct.

**Tolling of the Statute of Limitations**

117.    Defendants' deliberate concealment of Note 7 and the true parties in interest, combined with their reliance on falsified indorsements and fabricated documentation, constitutes fraudulent concealment. Under **14 M.R.S. § 859**, fraudulent concealment tolls the statute of limitations, thereby preventing Defendants from asserting a time-bar defense. This principle ensures that Plaintiffs are not unfairly prejudiced by Defendants' deliberate acts of deception, which obstructed the discovery of material facts necessary to bring this action.

118.    Plaintiffs exercised due diligence in uncovering the fraudulent scheme, including repeated requests sent over many years, for clarity regarding the chain of title and ownership. Defendants' refusal to disclose material information and their consistent misrepresentation of the true facts prevented Plaintiffs from discovering the fraud earlier.

119.    The statute of limitations is further tolled by Defendants' continued reliance on the fraudulent loan modification and their ongoing collection activities based on fabricated documents. This ongoing misconduct supports the applicability of equitable tolling principles and precludes Defendants from evading liability.

120.    By concealing the fraudulent nature of the loan modification and failing to disclose Note 7 until November 2024 and the true parties in interest, Defendants—both as original parties and as successors—have engaged in a continuous pattern of deceit.

121.    Their persistent reliance on fabricated notes and indorsements, from which they financially benefit, coupled with their refusal to acknowledge, address, or correct these material discrepancies in writing, deliberately undermines the validity of the modification. This deliberate

misconduct tolls the statute of limitations, ensuring Plaintiffs' claims remain actionable and Defendants' fraudulent conduct is not shielded by the passage of time.

**Elements of Fraudulent Misrepresentation Satisfied**

122.    The following elements of fraudulent misrepresentation are clearly satisfied based on the facts alleged:

123.    **(a) False Representation**:

• Defendants presented conflicting versions of the promissory note with fabricated indorsements and allonges, misleading Plaintiffs and the court. **(Exhibits A, B, C, D, D2 and F).**

• Defendants falsely represented GDBT 1 Trust 2011-1 as the **owner** of the loan **(Exhibit L4)** during the 2012 loan modification process, despite no recorded assignment in the Oxford County Registry of Deeds establishing its legal claim to the alleged loan at that time. The concealment of this material fact misled Plaintiffs into believing that Goshen Mortgage, LLC, was the true party in interest during the modification process, further obscuring the chain of title and Defendants' standing.

124.    **(b) Material Fact**: The authenticity of the promissory note is a material fact essential to determining enforceability and standing, both in foreclosure proceedings and in Plaintiffs' modification agreement.

125.    **(c) Knowledge of Falsity or Reckless Disregard for the Truth**: Defendants either knew the indorsements were false or acted with reckless disregard for the truth, as evidenced by recorded admissions **(Exhibit J, Call 3)**, documented inconsistencies in the notes **(Exhibit L)**, and Defendants' failure to address or correct material discrepancies despite repeated formal notifications **(Exhibit L3)**.

126.    **(d) Intent to Induce Reliance**: Defendants intended to induce reliance by Plaintiffs and the court, submitting varying versions of the promissory notes in legal proceedings and communications. These actions created a false appearance of valid ownership and enforceable rights

over the alleged loan. Defendants' correspondence **(Exhibit L)**, phone statements **(Exhibit J)**, and earlier communications by predecessors like American Bank **(Exhibit H)** demonstrate a deliberate attempt to validate their claims and compel Plaintiffs to act.

127. **(e) Justifiable Reliance by Plaintiffs and the Court**: Plaintiffs and the court justifiably relied on Defendants' representations, resulting in financial harm, emotional distress, and documented health issues **(Exhibits M and M2)**. Given Defendants' assertions of authority and authenticity, Plaintiffs had reasonable grounds to accept these representations as true.

**Final Conclusion**

128. The evidence demonstrates that SPS and U.S. Bank engaged in fraudulent misrepresentation by knowingly submitting and relying on conflicting promissory notes, concealing material facts, and inducing Plaintiffs to act to their detriment. Plaintiffs have suffered significant harm and are entitled to relief.

**Prayer for Relief**

129. Plaintiffs respectfully request the following relief from this Court:

**(a).** A declaration that Defendants' conduct constitutes fraudulent misrepresentation and a finding that their claims of ownership and authority over the loan are void.

**(b).** A declaration that the November 21, 2012 Loan Modification Agreement is null and void ab initio due to fraud, misrepresentation, and concealment of material facts.

**(c).** Compensatory damages for financial losses, emotional distress, and physical harm caused by Defendants' misrepresentations, in an amount to be determined at trial.

**(d).** Punitive damages to deter Defendants' egregious misconduct, as allowed under Maine law.

**(e).** Restitution for all payments wrongfully collected under fraudulent pretenses, including payments made under the 2012 Loan Modification Agreement and subsequent collections related to fabricated or misleading documentation.

**(f).** An order directing the correction and clearing of Plaintiffs' title to remove all clouds arising from fraudulent documents, including false assignments, fabricated indorsements, and other irregularities introduced by Defendants, restoring clear and marketable title to Plaintiffs' property.

**(g).** Any additional relief the Court deems just and proper.

**(h).** A declaration that the Allonge Sold documents and the July 2017 mortgage assignments executed by Bayview Loans and Bayview Dispositions are void, invalid, and without legal effect, and that their fraudulent creation and recording constitute a breach of public trust and Plaintiffs' rights.

**(i).** An order expunging the July 2017 assignments and any other fraudulent filings from the Oxford County Registry of Deeds, ensuring a clear and accurate public record of Plaintiffs' property title.

This page intentionally left blank

## COUNT 2

### Fraudulent Scheme and Use of Communications to Defraud

### (as to SPS and  U.S. Bank)

130.    Plaintiffs incorporate all previous paragraphs herein by reference.

**Overview of the Claim**

131.    This Count arises under Maine common law, which prohibits fraudulent schemes and conspiracies designed to deceive and harm victims. Defendants' actions, including their use of falsified documentation, fraudulent misrepresentation, and coordinated efforts to obscure the chain of title, constitute a deliberate pattern of wrongful conduct. Maine law provides remedies for such fraudulent and conspiratorial acts, ensuring accountability for harm caused by deceptive practices.

132.     Defendants knowingly engaged in a fraudulent scheme to misrepresent their standing, ownership, and enforceability of the alleged loan through the repeated use of misleading communications, including mailed documents and other correspondence, with the intent to induce Plaintiffs' reliance  and  compliance.

**Use of Fraudulent Communications to Perpetuate Fraud**

133.    Defendants relied on conflicting and falsified versions of the promissory note, including Notes 1, 5, and 7, each containing fabricated indorsements and allonges. These documents were transmitted via correspondence, including mail, to misrepresent the legitimacy of their claims and obscure material deficiencies in the chain of title.

134.    Despite knowing the discrepancies in these documents, Defendants failed to address Plaintiffs' inquiries regarding the authenticity of the promissory note or to correct the record, perpetuating their fraudulent claims to ownership and enforceability.

135.    On November 18, 2024, SPS introduced a new version of the promissory note, designated as "Note 7" **(Exhibit D2)**. This version included fabricated indorsements, including one

purporting to assign the loan from American Bank to Bayview Loan Servicing, LLC, despite no recorded assignment in the Oxford County Registry validating this transfer.

136. The discrepancies in the chain of title include:

• **(a)** Indorsements by Erla Carter-Shaw after her departure from Taylor, Bean & Whitaker in 2010, and after TBW ceased operations in 2009.

• **(b)** Assignments contradicting the documented chain of title, including a purported transfer to Bayview Loan Servicing, LLC, years before it appeared in the chain of assignments.

• **(c)** Fabricated indorsements inconsistent with recorded assignments, as reflected in the Oxford County Registry **(Exhibit K5)**.

137. Over several years, Defendants repeatedly transmitted false and misleading documents to Plaintiffs via mail and other correspondence. Examples include:

• Multiple versions of the promissory note, each with fabricated indorsements.

• Communications asserting false claims of ownership and enforceability.

• Notices designed to mislead Plaintiffs into compliance with invalid debt collection demands.

**Demonstration of Fraudulent Scheme**

138. The repeated use of misleading communications demonstrates Defendants' intent to deceive and harm Plaintiffs:

• **Materiality of Misrepresentations:** The authenticity of the promissory note is critical to establishing standing and enforceability.

• **Knowledge of Falsity:** Defendants knew of the discrepancies in the documents but failed to address them despite Plaintiffs' repeated inquiries and notifications.

• **Intent to Deceive:** Defendants' communications were intended to mislead Plaintiffs into believing the claims of ownership and enforceability were legitimate.

**Pattern of Fraudulent and Deceptive Practices Under Maine Law**

139.    Defendants transmitted multiple versions of the promissory note (see **Exhibit L**) and related communications, containing fabricated indorsements and allonges, through the mail over several years. These actions constitute a deliberate and repeated pattern of fraudulent misrepresentation and deceptive practices designed to mislead Plaintiffs and others regarding the ownership and enforceability of the alleged loan. Such conduct is actionable under Maine law, including the Maine Unfair Trade Practices Act (**5 M.R.S.A. § 207**) and common law fraud principles.

The following mailings from Defendants to Plaintiffs demonstrate the pattern of conflicting and fabricated documentation intended to create confusion and conceal the true nature of the alleged loan's ownership and enforceability:

• **September 28, 2017:** SPS mailed a copy of Note 1 with only one <u>blank indorsement</u>.
• **April 4, 2019:** Copy of Note 1 with a single indorsement.
• **November 19, 2018:** Copy of Note 1 with a single indorsement.
• **March 4, 2022:** Copy of Note 1 with a single indorsement.
• **May 13, 2022:** Copy of Note 1, including three allonges, with 2 of those specially indorsed).
• **January 27, 2023:** Copy of Note 1 with a single indorsement.
• **February 21, 2023:** Copy of Note 1 with a single indorsement.
• **April 13, 2023:** Copy of Note 1 with a single indorsement.
• **July 7, 2023:** Copy of Note 1 with a single indorsement.
• **November 18, 2024:** Copy of Note 7 with four indorsements and 3 allonges, all specially indorsed.

140.    These communications were intended to mislead Plaintiffs into accepting the legitimacy of Defendants' claims of ownership and enforceability, despite the conflicting and fabricated nature of the documents.

**Harm to Plaintiffs**

141.    As a direct result of Defendants' fraudulent conduct, Plaintiffs have suffered:

• Financial losses, including payments made under false pretenses.

• Emotional distress and anxiety resulting from prolonged uncertainty about the legitimacy of the loan.

• Physical harm, including health complications arising from stress.

**Tolling of the Statute of Limitations**

142. Defendants' fraudulent concealment of material facts, including the discrepancies in the promissory notes and assignments, tolls the statute of limitations under **14 M.R.S. § 859.**

**Elements of the Fraudulent Scheme Established**

143. The following elements demonstrate the fraudulent scheme:

• **(a)** Defendants used communications to transmit fabricated documents critical to their claims.

• **(b)** Defendants knowingly relied on false representations to obscure the chain of title.

• **(c)** Defendants acted with the intent to defraud Plaintiffs, as evidenced by their failure to correct discrepancies and their continued use of conflicting documents.

• **(d)** Plaintiffs suffered substantial harm, including financial, emotional, and physical damages, as a result of Defendants' misconduct.

**Prayer for Relief**

144. Plaintiffs respectfully request the following relief:

**1.** A declaratory judgment that Defendants' actions constitute fraudulent misrepresentation, violations of the Maine Unfair Trade Practices Act (**5 M.R.S.A. § 207**), and common law fraud principles.

**2.** Compensatory damages for financial losses, emotional distress, and physical harm suffered by Plaintiffs as a direct result of Defendants' fraudulent conduct and deceptive practices.

**3.** Punitive damages, as allowed under Maine law, to punish Defendants for their egregious misconduct and deter similar fraudulent actions in the future.

**4.** Restitution of all payments wrongfully collected from Plaintiffs under false pretenses and fabricated documentation.

**5.** Such other and further relief as this Court deems just and equitable, including costs of this action and any other remedies necessary to achieve fairness and justice.

## COUNT 3

### Contract Fraud

### (as to SPS and  U.S. Bank)

145.    Plaintiffs incorporate all previous paragraphs herein by reference.

**Overview of Contract Fraud Claim:**

146.    This Count arises under Maine contract law. Plaintiffs allege that Defendants SPS and U.S. Bank knowingly relied upon a fraudulently executed 2012 Loan Modification Agreement. This agreement was purportedly entered between Plaintiffs and AMS Servicing, LLC, acting on behalf of "GDBT I Trust 2011-1." Plaintiffs assert that the agreement was induced through material misrepresentations regarding ownership, authority, and the legitimacy of the underlying alleged loan documentation. **(Exhibit L4 and Exhibit D)**

147.    These misrepresentations, coupled with reliance on fabricated indorsements, concealed material facts, and non-existent recorded assignments, render the 2012 Loan Modification Agreement void ab initio under the legal maxim "fraud vitiates all contracts." Plaintiffs were fraudulently induced to forgo their legal rights and make payments under the false pretense that GDBT I Trust 2011-1 held legal ownership of the loan, despite no evidence supporting its inclusion in the chain of title (**Exhibit  K5**).

**Initial Misrepresentation of Ownership:**

148.    At the time of the 2012 Loan Modification Agreement, GDBT I Trust 2011-1 was identified as the rightful owner of the loan (**Exhibit L4, Page 1, Paragraph 1**). However, no recorded assignment, transfer, or indorsement exists in the Oxford County Registry of Deeds to substantiate this claim. This omission contradicts Defendants' assertion of ownership and highlights a critical defect in the legitimacy of the modification agreement.

149.    According to the official chain of title, Goshen Mortgage, LLC was the last recorded

owner of the alleged loan. By falsely identifying GDBT I Trust 2011-1 as the owner, AMS Servicing fraudulently induced Plaintiffs to enter into an agreement with an entity lacking any legal standing.

150.    Under Maine law, contracts obtained through fraudulent inducement are voidable at the option of the defrauded party. See ***Boivin v. Jones & Vining, Inc., 578 A.2d 187, 189 (Me. 1990)*** (recognizing fraudulent misrepresentation as grounds for rescinding contracts); ***Restatement (Second) of Contracts § 164*** (providing that a contract is voidable if assent is induced by a fraudulent or material misrepresentation upon which the recipient is justified in relying). Plaintiffs further assert that the absence of recorded assignments before or after the execution of the 2012 Loan Modification Agreement invalidates GDBT I Trust 2011-1's alleged ownership of the loan, rendering the modification unenforceable. Maine law recognizes that the chain of title and proper recording of assignments are essential to the enforceability of claims involving real property, and any break or defect in that chain undermines the validity of Defendants' claims.

151.    Plaintiffs contend that the fraudulent representations regarding GDBT I Trust 2011-1's ownership render the modification **void ab initio**.

**Fraudulent Documentation Supporting the Modification:**

152.    The 2012 Loan Modification Agreement's definitions section references the term "Note" to include "renewals, extensions, modifications, and loan adjustments." At the time of the modification, the most recent note presented by Defendants was Note 4 (**Exhibit D**), which bore fabricated indorsements. Despite Plaintiffs' inquiries into these discrepancies, Defendants failed to clarify or amend their reliance on this falsified document during or after the modification process.

153.    This falsified note was submitted under oath by the law firm Bendett and McHugh on behalf of AMS and Goshen Mortgage, LLC during earlier court proceedings. By basing the modification on Note 4, AMS Servicing embedded fraud into the agreement itself, rendering it unenforceable under Maine law.

**Role of AMS Servicing, SPS, and U.S. Bank**

154.    Acting on behalf of GDBT I Trust 2011-1, AMS Servicing collected a **$4,000** down payment from Plaintiffs and induced an additional six monthly trial payments totaling **$9,251.94** through false claims of ownership and authority.

155.    SPS and U.S. Bank, as successors to AMS Servicing, knowingly perpetuated the fraudulent modification agreement to collect payments and enforce rights. Despite formal notice of discrepancies provided by Plaintiffs through certified correspondence, including challenges to the validity of the note and chain of title (**Exhibit L3**), Defendants continued to rely on fabricated documentation to assert their claims.

156.    Defendants knowingly perpetuated the fraud by refusing to acknowledge discrepancies in the promissory notes and chain of title, thereby demonstrating willful ignorance and bad faith.

**Additional Evidence Undermining the Modification**

157.    Plaintiffs present newly discovered evidence that conclusively refutes GDBT I Trust 2011-1's ownership at the time of the modification (**Exhibit K6**), demonstrating the following:

**(a).** The March 1, 2012, Motion to Substitute Plaintiff filed by American Bank conclusively identified Goshen Mortgage, LLC as the alleged loan's successor in interest.

**(b).** The June 6, 2012, court order granted Goshen Mortgage, LLC substitution as the rightful owner, affirming its status as the legal holder of the alleged loan.

**(c).** No recorded assignment exists linking GDBT I Trust 2011-1 to the loan before, during, or after the modification agreement, highlighting the lack of a legitimate transfer.

158.    The absence of a valid transfer or assignment proves that AMS Servicing acted without authority, rendering the 2012 Loan Modification Agreement void.

**Misrepresentation Regarding Authority**

159.    AMS Servicing, acting on behalf of GDBT I Trust 2011-1, lacked documented authority to execute the modification agreement. Maine contract law does not permit servicers to bind non-owners to contracts absent clear documentation of ownership or authorization. This critical defect renders the modification agreement unenforceable and void ab initio.

160.    If Defendants assert that Goshen Mortgage, LLC was the rightful owner, AMS Servicing's misrepresentation of GDBT I Trust's ownership nullifies any claims of enforceability.

**Procedural Flaws and Boilerplate Jurisdictional References**

161.    The 2012 Loan Modification Agreement contains irrelevant references to **California Civil Code § 1542**, despite neither party having any connection to California. This jurisdictional mismatch underscores procedural flaws in the agreement's drafting and further undermines its enforceability under Maine law.

162.    Such a jurisdictional mismatch highlights procedural errors in drafting and reinforces the agreement's lack of enforceability.

**Legal Non-Execution of the Modification Agreement**

163.    The alleged 2012 Loan Modification Agreement was never legally executed under its own terms, which required AMS Servicing to act on behalf of a legitimate owner. GDBT I Trust 2011-1, designated as the "owner," held no recorded interest in the alleged loan at the time. AMS Servicing's execution of the agreement without proper authority or recorded transfer invalidates the contract.

**Inherent Contradiction and Chain of Title Collapse**

164.    If Defendants now claim that GDBT I Trust 2011-1 was the rightful owner at the time of the loan modification, they contradict the documented chain of title, which identifies Goshen Mortgage, LLC as the last recorded owner. This claim would effectively unravel the entire assignment chain and reveal the lack of a legitimate transfer.

**Response to Typographical Error Defense**

165.    In anticipation of any defense by Defendants that the inclusion of "GDBT I Trust 2011-1" in the 2012 Loan Modification Agreement was merely a typographical or administrative error, Plaintiffs submit the following rebuttal:

**(a). Clear Intent in Documentation:** The Loan Modification Agreement explicitly designates GDBT I Trust 2011-1 as the owner multiple times, indicating intentional representation rather than a clerical error.

**(b). Absence of Corrective Action:** No corrective action or amendment has been taken in the decade since the agreement's execution, reinforcing that this designation was deliberate.

**(c). Material Misrepresentation and Contract Validity:** Under Maine contract law, material misrepresentation in contract formation renders the agreement voidable. This misrepresentation induced Plaintiffs' reliance and compliance.

**(d). Pattern of Documentation Issues:** The error aligns with Defendants' broader pattern of discrepancies, including fabricated indorsements and conflicting versions of the promissory note, undermining any claim that this was an isolated mistake.

In sum, the Defendants' inclusion of "GDBT I Trust 2011-1" was central to the agreement's formation and subsequent enforcement. As such, any assertion of a "typo" defense would be both factually and legally inadequate.

**Elements of Contract Fraud Satisfied**

166.    Plaintiffs satisfy all elements of contract fraud:

**(a). False Representation**: Defendants misrepresented GDBT I Trust 2011-1 as the loan's rightful owner.

**(b). Material Fact**: Ownership of the alleged loan was critical to the agreement's validity.

**(c). Knowledge of Falsity**: Defendants knew or recklessly disregarded the absence of any recorded

assignment to GDBT I Trust 2011-1.

**(d). Intent to Induce Reliance**: Defendants intentionally misrepresented ownership to secure Plaintiffs' compliance and payments.

**(e). Justifiable Reliance**: Plaintiffs reasonably relied on Defendants' representations, including the production and presentation of Note 4, which directly caused financial losses and emotional harm.

**Prayer for Relief**

167. Plaintiffs respectfully request the following relief:

**1.** A judicial declaration that the 2012 Loan Modification Agreement is void ab initio.

**2.** Restitution of <u>all</u> payments made under the agreement.

**3.** Compensatory damages for financial losses, emotional distress, and physical harm.

**4.** Punitive damages to deter Defendants' willful and egregious misconduct.

**5.** Any additional relief the Court deems just and proper.

This page intentionally left blank.

## COUNT 4

### Breach of Fiduciary Duty

### (as to SPS and U.S. Bank)

168.    Plaintiffs incorporate all previous paragraphs herein by reference.

**Overview of Breach of Fiduciary Duty Claim:**

169.    This Count arises under Maine common law, which imposes fiduciary obligations on parties entrusted with managing others' interests. Defendants SPS and U.S. Bank, in their respective roles, breached their fiduciary duties through intentional misconduct, concealment of material facts, and reliance on fraudulent documents, causing Plaintiffs substantial harm.

**Fiduciary Responsibility of Defendants:**

170.    SPS, as servicer of Plaintiffs' mortgage, owed a duty of care in the administration of the loan, including the maintenance of accurate records, transparent communications, and due diligence in its collection efforts.

**U.S. Bank's Fiduciary Duties and Contradictions in Representations**

171.    U.S. Bank, as trustee, held additional fiduciary duties to Plaintiffs, including acting in good faith, ensuring the integrity of loan documentation, supervising the conduct of servicers, and protecting the trust's assets. U.S. Bank's public materials, including its brochure (**Exhibit H5, Page 2**), explicitly state that trustees are responsible for maintaining accurate records, ensuring compliance with trust documents, and assisting stakeholders. However, in a letter dated November 18, 2024 (**Exhibit H5, Paragraph 1**), U.S. Bank disavows any responsibility for the loan, claiming that it "has no authority or responsibility" for reviewing the servicer's actions or the loan documentation. This claim directly contradicts its obligations as outlined in its public materials, creating a clear inconsistency between U.S. Bank's stated duties and its actions in this case.

172.    Despite Plaintiffs' repeated efforts to obtain clarification regarding discrepancies in the

loan documentation **(Exhibit L3)**, U.S. Bank evaded their fiduciary obligations by directing Plaintiffs to the servicer, SPS, while simultaneously refusing to address the fraudulent nature of the documents they themselves relied upon. These contradictory positions reflect a pattern of evasion, bad faith, and intentional misconduct, breaching their fiduciary duty and causing Plaintiffs substantial harm.

**Defendants' Breach of Fiduciary Duty: Reliance on Fraudulent Documents**

173. Defendants knowingly relied on fraudulent documents containing fabricated indorsements, including Notes 2, 4 and 7 to assert claims of ownership and collect payments. These notes contained indorsements from Erla Carter-Shaw, purportedly made years after her departure from Taylor, Bean & Whitaker in February 2010, and following TBW's 2009 bankruptcy. **(Exhibits B & D and D2)**.

174. Despite not being involved in the initial foreclosure proceedings, Defendants adopted these documents by succession and have continued to use them to assert claims of ownership. This reliance persists despite receiving repeated certified notifications from Plaintiffs detailing discrepancies and inconsistencies in the documentation, as well as evidence undermining the authenticity of the promissory notes and chain of title.

175. Defendants' refusal to address or correct these known discrepancies constitutes a breach of their fiduciary duties to maintain transparency and act in good faith.

**Concealment of Material Facts**

176. Plaintiffs made multiple certified inquiries and sent formal correspondence to SPS identifying inconsistencies in the loan documentation and requesting clarification **(Exhibit L3)**.

177. Defendants either ignored or responded evasively to these inquiries, refusing to investigate or provide clear answers.

178. This pattern of evasion and concealment demonstrates Defendants' failure to act in Plaintiffs' best interests and underscores their deliberate disregard for fiduciary obligations.

179.     Plaintiffs' recent discovery of critical evidence underscores Defendants' egregious breach of their fiduciary duties of loyalty, care, and disclosure. Specifically, Bayview Loan Servicing executed a "Without Recourse" transfer of the promissory note to Bayview Dispositions in February 2017, followed by Bayview Dispositions' "Without Recourse" transfer of the same promissory note to Chimera Funding in March 2017. Despite these transfers, which unequivocally relinquished all rights to the alleged loan, note, and mortgage, both Bayview entities subsequently executed  assignments of the mortgage in July 2017 and later recorded them with the Oxford County Registry of Deeds. These assignments falsely asserted ownership rights that had already been relinquished months earlier.

180.     The "Allonge Sold" documentation for these fraudulent assignments, created and recorded after both Bayview entities had surrendered all rights to the alleged loan and mortgage, were intentionally excluded from the Collateral File provided to Plaintiffs in November 2024. This omission demonstrates a deliberate effort to conceal the true chain of title and mislead Plaintiffs regarding Defendants' lack of standing to enforce the loan or collect payments. By withholding these documents, Defendants perpetuated a scheme to obscure their reliance on a flawed and fraudulent chain of title.

181.     Compounding the harm, at the time the fraudulent July 2017 assignments were executed and recorded, SPS and U.S. Bank were already servicing and claiming ownership of the alleged loan. As servicer and trustee, respectively, Defendants owed Plaintiffs a fiduciary duty to verify the integrity of the loan's chain of title. Instead, they knowingly relied on documents that were invalid and irreparably tainted, abdicating their duty of care and actively participating in the concealment of material facts.

182.     Defendants' reliance on these fraudulent documents was neither accidental nor the result of administrative oversight. Instead, it reflects a calculated effort to maintain their claims of ownership, pursue foreclosure proceedings, and collect payments from Plaintiffs under false pretenses. Defendants deliberately concealed these material facts, to preserve the illusion of lawful ownership and evade

accountability.

183. This pattern of intentional concealment and evasion is further demonstrated by Defendants' responses to Plaintiffs' certified inquiries in November 2024. Despite Plaintiffs' explicit requests for clarification regarding the authenticity of the promissory note, Defendants failed to disclose the existence of the February and March 2017 Allonge Sold documentation or the fraudulent July 2017 assignments. Instead, they provided incomplete and misleading documentation designed to obscure the true facts, further violating their fiduciary obligations.

184. The concealment of these critical documents has caused significant harm to Plaintiffs, including but not limited to:

• **(a)** Obstructing Plaintiffs' ability to challenge Defendants' standing to enforce the mortgage;

• **(b)** Perpetuating Defendants' unlawful collection actions and inducing Plaintiffs to make payments under false pretenses;

• **(c)** Creating an irreparable cloud on the title to Plaintiffs' property, which prevents them from enjoying or transferring their property rights; and

• **(d)** Causing Plaintiffs substantial financial, emotional, and physical harm, as evidenced by medical records and correspondence with Defendants.

**Misrepresentation of Note Ownership**

185. Recorded calls reveal SPS agents acknowledging discrepancies in the promissory note and expressing uncertainty about which version is valid, including statements such as, "I don't know which one was originally stamped in" (**Exhibit J, Call 3**). Despite this internal awareness of inconsistencies, SPS and U.S. Bank continued to assert ownership and enforce rights based on these fraudulent and conflicting documents. Defendants refused to rectify these errors or disclose these material issues to Plaintiffs, perpetuating their reliance on fabricated records and concealing the true nature of the discrepancies.

186. This conduct directly violates Defendants' fiduciary duty to provide accurate information and refrain from deceptive practices.

**Ongoing Breach and Unjust Enrichment**

187. Defendants knowingly collected payments from Plaintiffs under false pretenses of valid ownership and enforcement rights. These actions demonstrate Defendants' intentional choice to exploit their position of trust for financial gain.

188. Under Maine law, Defendants' receipt of payments to which they were not entitled constitutes unjust enrichment, as they derived financial benefit through their breaches of fiduciary duty.

**Harm to Plaintiffs**

189. Defendants' breaches of fiduciary duty caused Plaintiffs significant harm, including:

**(a).** Financial losses from payments made under false pretenses.

**(b).** Emotional distress stemming from Defendants' deceptive and evasive conduct.

**(c).** Physical health impacts due to prolonged stress, as documented in Plaintiffs' medical records **(Exhibits M & M2)**.

**Legal Precedents Supporting Breach of Fiduciary Duty Claims**

190. Under Maine law, fiduciaries are held to heightened standards of honesty, transparency, and good faith. Courts have consistently recognized that concealment of material facts and reliance on fraudulent documents can constitute actionable breaches of fiduciary duty. The following legal precedents and authorities provide a foundation for Plaintiffs' claims:

**(a).** *Stewart v. Machias Savings Bank*, **762 A.2d 44, 46 (Me. 2000)**: The court held that fiduciary relationships require a duty of utmost good faith and full disclosure of all material facts. This decision underscores that fiduciaries cannot act in a way that undermines the trust and reliance placed upon them by the beneficiaries or other parties.

**(b).** *Fortin v. Roman Catholic Bishop of Portland*, **871 A.2d 1208, 1220 (Me. 2005)**: The court

emphasized that fiduciaries must act with the highest degree of loyalty and honesty toward those to whom the duty is owed. A breach of this duty occurs when a fiduciary prioritizes their own interests over those of the party to whom the duty is owed, particularly through concealment or misrepresentation.

**(c).** Under **Restatement (Third) of Trusts § 78**, trustees and fiduciaries are required to administer trust affairs with loyalty, good faith, and full disclosure, avoiding misleading beneficiaries or concealing key information. This principle aligns with Maine law and has been frequently cited by Maine courts to evaluate fiduciaries' conduct. Defendants' actions fall short of these fiduciary obligations, as evidenced by their lack of transparency and concealment of critical information regarding the chain of title.

**(d).** Maine Unfair Trade Practices Act (MUTPA), **5 M.R.S. § 207**: Defendants' conduct also violated the Maine Unfair Trade Practices Act, which prohibits unfair or deceptive practices in trade or commerce. Concealing material facts, knowingly relying on fraudulent documentation, and failing to clarify legal standing despite Plaintiffs' inquiries constitute unfair and deceptive practices under Maine law.

**(e).** *Sargent v. Buckley*, **697 A.2d 1272, 1275 (Me. 1997)**: The Maine Supreme Judicial Court held that fiduciaries must avoid conflicts of interest and disclose material facts to avoid misleading parties relying on their representations. A fiduciary's failure to disclose such information can support claims for damages and equitable relief.

**Elements of Breach of Fiduciary Duty Satisfied**

191.    The following elements of breach of fiduciary duty are satisfied under Maine law:

**(a). Existence of a Fiduciary Relationship:** SPS, as servicer, and U.S. Bank, as trustee, owed fiduciary duties to Plaintiffs by virtue of their roles in managing the alleged mortgage loan, including handling payments, overseeing the loan's administration, and safeguarding Plaintiffs' financial and legal interests.

**(b). Breach of Duty:** Defendants breached these duties by:

• Relying on fraudulent and materially altered documents, including fabricated promissory notes and assignments;

• Failing to correct known discrepancies in the chain of title; and

• Concealing material facts regarding the true ownership and enforceability of the alleged loan.

**(c). Causation:** Defendants' breaches directly caused Plaintiffs' harm, including financial losses, emotional distress, and physical health impacts arising from the uncertainty and stress created by Defendants' deceptive practices.

**(d). Damages:** Plaintiffs have suffered measurable harm, including substantial economic losses, reputational damage, emotional anguish, and adverse health consequences, justifying compensatory and punitive damages under Maine law.

### Further Legal Analysis

192.    Fiduciaries are held to the highest standards of good faith, honesty, and transparency in their dealings. Maine law imposes a clear duty on fiduciaries to avoid conflicts of interest and to disclose material information. See ***Mansir v. United Services Auto. Ass'n*, 589 A.2d 471, 472 (Me. 1991).**

### Additional Violations Under Maine Law

193.    Defendants' actions also violated the **Maine Unfair Trade Practices Act (MUTPA), 5 M.R.S. § 207**, which prohibits unfair and deceptive practices in trade or commerce. Specifically, Defendants:

• Concealed material facts from Plaintiffs regarding the true chain of title and ownership of the alleged loan;

• Knowingly relied on fraudulent documentation to justify payment demands; and

• Failed to clarify their legal standing despite Plaintiffs' repeated inquiries, thereby perpetuating a

deceive and misleading course of conduct.

**Tolling of the Statute of Limitations**

194.     Under Maine law, active concealment of material facts tolls the statute of limitations. See **14 M.R.S. § 859**. Defendants actively concealed critical information regarding the chain of title, fabricated indorsements, and other material discrepancies in the loan documentation. Plaintiffs were unable to reasonably discover the full extent of this fraudulent conduct until October and November 2024, when newly uncovered evidence exposed the fraudulent foundation of the promissory notes and modification agreement.

**Conclusion**

195.     Defendants' actions constitute a flagrant breach of fiduciary duty and a deliberate violation of Maine law. Their calculated reliance on fraudulent documents, intentional concealment of material facts, and continued collection of payments—despite their knowledge of the falsity of their claims—represent egregious misconduct.

Defendants falsely represented Notes 1 and 5 (**Exhibit L**) as true copies of the original promissory note, inducing Plaintiffs' reliance and continuing their collection actions under false pretenses. This deliberate misrepresentation highlights Defendants' disregard for Plaintiffs' rights and obligations under Maine law.

Defendants' breaches have caused Plaintiffs significant financial, emotional, and physical harm. Plaintiffs respectfully request full restitution, compensatory damages, punitive damages to deter future misconduct, and any further relief this Court deems necessary to prevent ongoing or future harm.

**Prayer for Relief**

196.     Plaintiffs respectfully request the following relief:

**1. Declaratory Relief**: A judicial declaration that Defendants' conduct constitutes a breach of fiduciary duty, including their reliance on fraudulent documentation, concealment of the "Allonge Sold"

documents, and the execution of assignments by entities with no legal authority.

**2. Restitution**: Restitution for all payments wrongfully collected under false pretenses, including amounts paid in reliance on fraudulent claims of ownership or standing.

**3. Compensatory Damages**: Compensation for financial losses, emotional distress, and physical harm caused by Defendants' misconduct, including damages resulting from the fraudulent assignments, concealed chain of title, and induced payments under false pretenses.

**4. Punitive Damages**: An award of punitive damages to deter Defendants' egregious misconduct and prevent future harm to borrowers by holding Defendants accountable for their deliberate and systematic violations of Maine law.

**5. Injunctive Relief**: A permanent injunction:

• **a.** Prohibiting Defendants from continuing collection efforts or initiating foreclosure proceedings based on fraudulent documentation or an invalid chain of title.

• **b.** Directing the expungement of all fraudulent assignments, including the July 2017 assignments and any subsequent filings derived from them, from the Oxford County Registry of Deeds.

**6. Expungement of Records**: An order compelling the Oxford County Registry of Deeds to remove any fraudulent filings, including but not limited to the July 2017 assignments and subsequent filings, to restore the integrity of Plaintiffs' property title and ensure it is free of clouds.

**7. Production and Cancellation of Fraudulent Documents**: An order requiring Defendants to produce the original wet-ink promissory note for inspection and validation and cancel any fabricated or altered versions, including those containing conflicting or impossible indorsements.

**8. Enhanced Relief Due to Concealment**: Additional compensatory and punitive damages for Defendants' deliberate concealment of material documents, including the February and March 2017 "Allonge Sold" documents, which materially obstructed Plaintiffs' ability to challenge Defendants' claims.

**9. Attorney's Fees and Costs**: An award of reasonable fees and costs incurred in investigating and litigating Defendants' breach of fiduciary duty and fraudulent conduct.

**10. Any Further Relief**: Such other relief as the Court deems just and proper under the circumstances, including remedies to address the irreparable harm caused by the clouded title and fraudulent documentation.

This page intentionally left blank

# COUNT 5

## Unjust Enrichment

## (as to SPS and U.S. Bank)

197.    Plaintiffs incorporate all previous paragraphs herein by reference.

**Overview of Unjust Enrichment Claim:**

198.    This Count arises under Maine common law, which prohibits a party from unjustly retaining benefits obtained at another's expense without legal justification. Defendants SPS and U.S. Bank unjustly enriched themselves through the collection of payments from Plaintiffs, despite lacking legitimate standing, authority, or a valid claim to the loan. These payments were induced through material misrepresentations, fabricated documentation, and a fraudulent November 21, 2012 Loan Modification Agreement, rendering their retention of these payments inequitable under Maine law.

**Defendants' Absence of Legal Standing and Right to Enrichment**

199.    Defendants collected payments under the false pretense that they held valid ownership and servicing rights to Plaintiffs' alleged mortgage loan.

200.    The underlying promissory note, assignments, and alleged loan modification agreement contained fabricated indorsements and inconsistencies, breaking the chain of title and rendering Defendants' claims to the loan legally invalid.

201.    Recent evidence further demonstrates that Defendants' claims to the alleged loan and their collection of payments were based on a fundamentally invalid chain of title. Specifically, the February and March 2017 'Allonge Sold' documents reveal that Bayview Loans executed "Without Recourse" transfers of the promissory note to Bayview Dispositions, which subsequently executed "Without Recourse" transfers of the same note to Chimera Funding. Through these transfers, both Bayview entities unequivocally relinquished all rights to the alleged loan. Despite these transfers, Bayview proceeded to execute and record fraudulent assignments in July 2017, creating a false

appearance of ownership.

202. At the time these assignments were executed and recorded, Defendants SPS and U.S. Bank were already servicing and claiming ownership of the alleged loan in their roles as servicer and trustee, respectively. By knowingly relying on this invalid chain of title, which was tainted by fraudulent assignments and concealed transfers, Defendants SPS and U.S. Bank continued to collect payments from Plaintiffs under false pretenses, rendering their retention of funds unjust and inequitable.

203. Each payment collected by SPS and U.S. Bank constitutes unjust enrichment due to their lack of legitimate standing.

**Financial Benefits Derived from Fraudulent Conduct**

204. Maine law recognizes that retaining benefits derived through misrepresentation is inequitable and justifies restitution. See *Aladdin Elec. Assocs. v. Old Orchard Beach Convalescent Ctr.*, **645 A.2d 1142, 1144** (Me. 1994).

**Financial Benefits Derived from Fraudulent Conduct**

205. In 2012, AMS Servicing, acting on behalf of GDBT I Trust 2011-1, induced Plaintiffs to enter into a loan modification agreement based on false representations. This agreement required Plaintiffs to make:

• A **$4,000** down payment;

• **$9,251.94** in trial payments under the Trial Payment Plan ;

• Monthly payments of **$1,074.52** starting in January 2013; and

• Additional legal fees totaling **$4,000**.

206. Over more than a decade, Plaintiffs paid approximately **$164,469.18** to Defendants, excluding property taxes.

207. AMS Servicing lacked legitimate authority to execute the modification, as GDBT I Trust

55

2011-1 had no recorded interest in the alleged loan. Defendants relied on fabricated indorsements in Note 4 to assert their claims, rendering the modification agreement void *ab initio*.

208.     By continuing to collect payments under false pretenses, SPS and U.S. Bank knowingly and unjustly enriched themselves at Plaintiffs' expense.

209.     Even after Plaintiffs raised repeated concerns regarding discrepancies in the alleged loan documentation, Defendants failed to provide validation or rectify known issues. Retaining these payments in the face of Plaintiffs' objections further highlights the inequitable nature of Defendants' actions.

**Willful and Continuous Misrepresentation Supporting Unjust Enrichment**

210.     Defendants knowingly and repeatedly relied on fraudulent documentation to induce payments. Multiple mailings of Note 1 and other conflicting versions of the promissory note were sent to Plaintiffs as part of this deceptive effort **(Exhibit L)**.

211.     Defendants knowingly and repeatedly relied on fraudulent documentation—including conflicting versions of the promissory note, fabricated assignments, and the concealed "Allonge Sold" documents—to induce payments from Plaintiffs. By concealing the February and March 2017 allonges and supporting documentation while relying on the fraudulent July 2017 assignments, Defendants falsely asserted claims to the alleged loan without legitimate authority.

212.     Defendants knowingly and repeatedly relied on fraudulent documentation to induce payments. Multiple communications, including mailed copies of Note 1 and other conflicting versions of the promissory note, and phone calls to Plaintiffs were used as part of this deceptive effort. For example, during a December 15, 2022 call **(Exhibit J, Call 4)**, an SPS agent falsely claimed that SPS held the original promissory note. Plaintiffs relied on this assertion, resulting in a payment of $1,634.87 made under false pretenses. These misrepresentations demonstrate Defendants' intent to deceive and unjustly enrich themselves at Plaintiffs' expense.

**Unjust Enrichment and Violation of Equity Principles**

213.    Defendants knowingly derived financial benefits through false pretenses, fraudulent documentation, and material misrepresentation. By exploiting Plaintiffs' reliance on their misrepresentations and retaining payments based on invalid claims, Defendants violated principles of equity and good conscience.

214.    Under Maine law, unjust enrichment arises when one party retains an unfair benefit at the expense of another without legal justification. See *Estate of White*, **521 A.2d 1180, 1183 (Me. 1987)**. Defendants' actions violated these principles by collecting payments based on:

• Invalid claims to the loan;

• Fabricated indorsements and assignments; and

• A modification agreement executed by an entity lacking ownership or authority.

**Violation of Equity Principles and Legal Basis for Relief**

215.    Under Maine law, unjust enrichment arises when one party retains an unfair benefit at the expense of another without legal justification. See **Estate of White, 521 A.2d 1180, 1183 (Me. 1987)**. Defendants' actions violated principles of equity by collecting payments based on:

• Invalid claims to the loan;

• Fabricated indorsements and assignments; and

• A modification agreement executed by an entity lacking ownership or authority.

216.    Recent evidence reveals that Defendants intentionally concealed the February and March 2017 "Allonge Sold" documents, which demonstrated that Bayview Loans and Bayview Dispositions had relinquished all rights to the alleged loan prior to executing the July 2017 assignments. By omitting these critical documents from the collateral file provided to Plaintiffs in November 2024, Defendants perpetuated the illusion of a valid chain of title. This concealment allowed Defendants to collect monthly payments under false pretenses, further enriching themselves at

Plaintiffs' expense.

217.     Defendants' actions reflect a coordinated scheme to exploit Plaintiffs' reliance on their misrepresentations and to profit through deception. Their intentional reliance on fabricated documentation and failure to disclose material facts constitute unjust enrichment. Plaintiffs are entitled to restitution for all payments collected without legal justification.

**Elements of Unjust Enrichment Satisfied**

218.     Under Maine law, unjust enrichment arises when one party retains a benefit at the expense of another, without legal justification. The following elements are satisfied in this case:

**(a) Benefit Conferred:** Plaintiffs paid over $164,469.18 to Defendants, who accepted and retained these funds without any rightful claim or authority.

**(b) Injustice:** Defendants' retention of these payments is unjust, as it relied on the deliberate concealment of the February and March 2017 "Allonge Sold" documents, which invalidated their chain of title. Plaintiffs were misled into making payments under the false belief that Defendants had a legitimate claim to enforce the loan.

**(c) Absence of Justification:** Defendants lacked both legal and equitable grounds to collect or retain these payments, as their claims to the alleged loan and the modification agreement were based on fraudulent and fabricated documentation.

**Conclusion**

219.     Defendants' actions in collecting payments without legitimate authority, while knowingly relying on fabricated indorsements and material misrepresentations, constitute a clear case of unjust enrichment under Maine law. Plaintiffs are entitled to restitution for the payments wrongfully collected and compensatory relief for the financial and emotional harm caused by Defendants' egregious conduct.

220.     Maine equity law supports recovery in cases where one party unjustly profits at

another's expense, particularly when the profit results from fraudulent conduct. Plaintiffs respectfully request that this Honorable Court declare Defendants' retention of payments unlawful and inequitable, and grant the relief sought to restore Plaintiffs to their rightful position.

**Damages and Relief Sought**

221. Plaintiffs seek the following relief:

**1. Restitution:** Plaintiffs request full restitution of all payments made under false pretenses, including the **$4,000** down payment, trial payments, and monthly payments wrongfully collected based on concealed "Allonge Sold" documents and fraudulent assignments. The total amount sought for restitution is approximately **$164,469.18**.

**2. Compensatory Damages:** Plaintiffs request compensatory damages for financial losses, emotional distress, and physical harm caused by Defendants' unlawful conduct.

**3. Prejudgment Interest:** Plaintiffs request an additional **$59,208.91** in prejudgment interest on the amounts wrongfully collected, to compensate Plaintiffs for the loss of use of these funds and to ensure equity is achieved.

**4. Injunctive Relief:** Plaintiffs request injunctive relief prohibiting Defendants from engaging in further collection efforts based on fraudulent documentation or invalid claims to the loan under Maine common law principles.

**5. Punitive Damages:** Plaintiffs request punitive damages to deter Defendants' willful, egregious, and fraudulent misconduct and to ensure that similar unlawful actions are prevented in the future.

This page intentionally left blank

## COUNT 6

### Filing of False Documents

### (as to SPS and U.S. Bank)

222.    Plaintiffs incorporate all previous paragraphs herein by reference.

**Overview of Count – Filing of False Documents**

223.    This Count addresses Defendants' deliberate submission of fraudulent and backdated documents to the Oxford County Registry of Deeds and in court filings. These actions were taken to create an appearance of legitimate title, falsely bolster claims of ownership and standing, and cloud Plaintiffs' title to the property.

224.    Defendants' conduct caused significant harm, impairing Plaintiffs' ability to sell or freely enjoy their property. The clouding of title has devalued the property, rendered it difficult to market, and, in practical terms, made it unmarketable.

225.    Between 2014 and 2016, Plaintiffs received multiple unrecorded creditor notifications **(see Exhibits K2, K3, and K4)** indicating that U.S. Bank was transferring the alleged loan among its managed trusts without corresponding assignments in the public record. These transfers took place while Bayview Loan Servicing simultaneously held the alleged loan by recorded assignment during the same period **(Exhibit K5)**.

226.    These unrecorded transfers, combined with overlapping and retroactive assignments, reflect a systematic disregard for proper title recording. This lack of transparency created conflicting ownership claims, raising serious questions about the legitimacy of Defendants' purported rights.

**Fraudulent and Backdated Assignments**

227.    The most glaring example is the 2022 Quit Claim Assignment executed by Taylor, Bean & Whitaker (TBW), which purported to transfer rights over a decade after TBW ceased lending operations in 2009 due to bankruptcy.

228. Despite having no legitimate rights to the mortgage, this assignment falsely represented TBW as the "Lender," an attempt to fabricate authority and legitimacy. This blatant misrepresentation underscores Defendants' calculated scheme to manufacture a plausible chain of title **(Exhibit K)**.

**False Filings to Mask Ownership Gaps**

229. Recorded assignments and allonges reveal systematic patterns of backdating, document fabrication, and shifting indorsements. These irregularities were intentionally designed to obscure glaring breaks in the chain of title.

230. These shifting indorsements, combined with fabricated allonges, created a false narrative of ownership continuity. For example:

**(a).** The Taylor, Bean & Whitaker (TBW) special indorsement directly to American Bank bypassed MCMCAP Homeowners Advantage Trust IV, despite the recorded assignment to MCMCAP on June 1, 2009, conclusively severing TBW's authority over the alleged note.

**(b).** The American Bank allonge purporting to specially indorse the alleged note directly to Bayview Loan Servicing completely skips over Goshen Mortgage and Christina Trust, entities that appear in the recorded chain of assignments.

231. Notably, three allonges **(Exhibit E)** that initially accompanied the note disappeared from the document chain entirely after being presented in May 2022. This omission left the note resembling its 2007 origination—a blank bearer instrument that U.S. Bank, through its servicer SPS, continued to claim as the "original" until July 2023 **(Exhibit F)**.

232. Plaintiffs have recently uncovered critical evidence from the Allonge Sold documents, revealing fundamental flaws in the chain of title for the alleged mortgage loan. Specifically, a Bayview Loans transfer of the note and accompanying mortgage to and Bayview Dispositions executed 'Without Recourse' and a subsequent transfer of the note and accompanying mortgage to Chimera Funding in February and March of 2017, thereby relinquishing all rights to the alleged loan (see **Exhibit E**,

Allonge Sold Documents).

233.     Despite these transfers, both Bayview entities executed mortgage assignments in July 2017, falsely asserting ownership rights that had already been waived.

234.     The Allonge Sold documents, omitted from the collateral file provided by SPS in November 2024, were essential to uncovering this timeline discrepancy. These documents, alongside Note 7, expose the deliberate concealment of material facts and the fabrication of legitimacy through knowingly false filings. The July 2017 assignments were recorded during the period when SPS and U.S. Bank were servicing the loan and claiming ownership, further compounding the misrepresentation.

235.     The July 2017 assignments created an irreparable cloud on Plaintiffs' title and a false public record in the Oxford County Registry of Deeds, perpetuating uncertainty regarding the ownership and enforceability of the alleged loan. These actions demonstrate a calculated effort to obscure gaps in the chain of title and mislead both Plaintiffs and the public regarding Defendants' claims.

**Introduction of Fabricated Note 7**

236.     On November 18, 2024, SPS introduced Note 7 **(Exhibit D2)** in correspondence to Plaintiffs. Sent after Plaintiffs served SPS and U.S. Bank with a Settlement Demand Letter, this document   includes:

• A fabricated special indorsement from Taylor Bean & Whitaker (TBW) to American Bank.

• An allonge specially indorsing the note from American Bank directly to Bayview Loan Servicing.

237.     Both indorsements are legally impossible:

**(a).** TBW ceased operations in 2009 following a federal raid and bankruptcy.

**(b).** EVP Erla Carter-Shaw, who allegedly executed the indorsement, left TBW in February 2010.

**(c).** TBW had already transferred the alleged loan to MCMCAP Homeowners Advantage Trust IV in

2009, severing any authority to make subsequent indorsements.

238. SPS transmitted Note 7 to Plaintiffs, representing it as the definitive promissory note from its current collateral file, despite its glaring inconsistencies with prior versions (Notes 1, 2, and 4). The sudden appearance of this document, after seven years of refusing to acknowledge Notes 2 and 4, underscores SPS's intent to conceal prior fraudulent actions and create an illusion of legitimacy.

**Harm Caused by False Filings**

239. Defendants' filing of fraudulent documents clouded Plaintiffs' title, disrupted court proceedings, and imposed substantial financial and legal burdens.

240. The introduction of Note 7 exacerbates the harm caused to Plaintiffs by perpetuating uncertainty about the legitimacy of the loan documents. This new version creates additional breaks in the chain of title and further clouds Plaintiffs' property title.

241. The resulting uncertainty continues to harm Plaintiffs by:

• Hindering their ability to sell, or enjoy their property.

• Requiring Plaintiffs to incur significant legal expenses to address the clouded title.

• Creating financial obstacles due to diminished market value and lost opportunities.

**Conclusion**

242. Defendants' deliberate filing of fraudulent and backdated documents constitutes a clear violation of law and a calculated attempt to assert rights they do not possess. These filings perpetuated a scheme that misled courts, induced payments from Plaintiffs, and unlawfully preserved Defendants' claims to the loan. Plaintiffs request full invalidation of these filings, total restoration of their title, and appropriate relief for the harm caused.

This page intentionally left blank

**Relief Sought for Filing of False Documents**

243.    Plaintiffs  respectfully  request:

## 1. Expungement of Fraudulent Recordings

Plaintiffs respectfully request that this Court issue an order expunging all fraudulent assignments and recordings related to the subject property from the Oxford County Registry of Deeds. Specifically, this includes documents originating from Taylor, Bean & Whitaker, American Bank, Bayview Loan Servicing, and other entities that filed fabricated or invalid instruments, such as the July 2017 assignments. These documents were based on fraudulent transfers and fabricated indorsements, creating an unjust cloud on the title. Expunging these documents is necessary to preserve the integrity of the property records and protect Plaintiffs' property rights under the principles of Maine property law.

## 2. Restoration of Marketable Title

Plaintiffs further request that this Court issue an order restoring the title to its original, unencumbered state by eliminating all clouds, gaps, and fraudulent claims in the chain of title. Defendants' reliance on fabricated indorsements, invalid assignments, and concealed documentation has rendered the title unmarketable. Restoring marketable title aligns with the principles of Maine property law, which prioritizes the integrity of recorded instruments and the equitable resolution of title disputes. Plaintiffs seek this relief to ensure the property is free from any fraudulent claims or encumbrances, enabling its rightful  and  lawful  use.

## 3. Declaration of Invalidity

A declaration invalidating all fraudulent recordings, including the July 2017 assignments, the 2022 TBW Quit Claim Assignment, and subsequent filings, as authorized under Maine Rules of Civil Procedure, Rule 57. This includes a finding that these recordings were knowingly false and intended to obscure  ownership  gaps.

**4. Clearance of Title Claims**

Plaintiffs respectfully request an order declaring all fraudulent and invalid filings related to the subject property void and unenforceable. Defendants' actions, including the fabrication and recording of assignments and other instruments, have clouded Plaintiffs' title and undermined their ownership rights. Plaintiffs seek the removal of these invalid filings to restore the title to its rightful state, free of any claims by Defendants or other entities acting under fraudulent pretenses. This request is based on established principles of equity and the need to preserve the integrity of Maine's property recording system.

**5. Compensatory Damages**

Plaintiffs seek compensatory damages for financial losses incurred due to Defendants' actions, including diminished property value, lost time, and the costs of addressing the fraudulent recordings and claims. Plaintiffs have been harmed not only financially but also emotionally, as the uncertainty surrounding their title has caused significant stress and disruption. The damages requested reflect the harm suffered as a direct result of Defendants' reliance on false and misleading documents, including fabricated assignments and indorsements.

**6. Punitive Damages**

Plaintiffs request punitive damages to deter Defendants from engaging in similar egregious conduct in the future. Defendants' actions, including the deliberate concealment of critical documents and reliance on fabricated filings, demonstrate a willful disregard for Plaintiffs' rights and the law. Punitive damages are necessary to hold Defendants accountable for their actions and to send a clear message that such behavior will not be tolerated.

This page intentionally left blank

## COUNT 7

## Violations of Maine's Unfair Trade Practices Act (UTPA)

## (as to SPS and U.S. Bank)

244. Plaintiffs incorporate all previous paragraphs herein by reference.

**Overview of UTPA Violations Claim:**

245. This Count arises under the Maine Unfair Trade Practices Act **(5 M.R.S. § 205-A et seq.)**, which prohibits unfair, deceptive, and fraudulent practices in trade or commerce. Plaintiffs allege that Defendants SPS and U.S. Bank engaged in repeated deceptive, fraudulent, and bad-faith actions during the servicing and collection of Plaintiffs' alleged loan, causing substantial harm.

**Deceptive Practices in Violation of UTPA:**

246. Defendants engaged in unfair and deceptive practices in the following ways:

• **Misrepresentation of Debt Ownership and Standing:** Defendants sent communications falsely asserting ownership of the alleged loan, despite material discrepancies in the chain of title and loan documentation.

• **Failure to Respond to Plaintiffs' Cease and Desist Letter:** Despite acknowledging Plaintiffs' October 2024 cease-and-desist directive, Defendants continued collection efforts, including sending misleading correspondence and default notices **(Exhibits H3 and H4)**.

247. Defendants' actions were designed to mislead Plaintiffs into believing the alleged loan was enforceable and that payments were legally required, despite evidence to the contrary.

**Specific Examples of Deceptive Practices:**

248. The following examples illustrate Defendants' deliberate pattern of deception:

**1. Introduction of Fabricated Note 7:** On November 18, 2024, SPS sent Note 7 **(Exhibit D2)** to Plaintiffs. This version contained fabricated indorsements contradicting prior versions of the note and the recorded chain of title. These discrepancies included:

• Indorsements allegedly executed by TBW years after its 2009 closure.

• A special indorsement from American Bank to Bayview Loan Servicing, LLC, predating Bayview's documented involvement in the alleged loan.

**2. Contradictory Responses Regarding Ownership:** Defendants provided conflicting explanations about the alleged loan's ownership, with SPS identifying U.S. Bank as the owner while U.S. Bank disclaimed any involvement **(Exhibits H4 and H5)**.

**3. Flood of Misleading Communications:** Between November 14 and 19, 2024, SPS sent at least 16 letters, including collection notices, default notifications, and contradictory information regarding the loan. These letters ignored Plaintiffs' cease-and-desist directive and added to the confusion **(Exhibit H3)**.

**Reliance on Fraudulent Assignments and Concealment of Material Facts:**

249.    Defendants SPS and U.S. Bank knowingly relied on fraudulent assignments created and recorded by Bayview Loans and Bayview Dispositions in July 2017 to support their claims of ownership and enforceability of the alleged loan. These assignments were executed months after Bayview entities had relinquished all rights to the alleged loan through "Without Recourse" transfers in February and March 2017. By relying on these invalid and misleading assignments, Defendants perpetuated the false appearance of ownership, despite the underlying chain of title being irreparably tainted.

**Omission of February and March 2017 'Allonge Sold' Documents:**

250.    Defendants omitted the February and March 2017 "Allonge Sold" documents from the Collateral File provided to Plaintiffs in November 2024. This deliberate omission concealed the critical evidence that Bayview entities had transferred all rights to the alleged loan to Chimera Funding before the July 2017 assignments were executed and recorded. This concealment obstructed Plaintiffs' ability to challenge Defendants' claims of ownership and prevented them from protecting their property rights.

251. This omission was a deliberate attempt to mislead Plaintiffs and the Court regarding the legitimacy of Defendants' claims of ownership, thereby obstructing justice and furthering their deceptive scheme.

**Deceptive Practices Under UTPA:**

252. Maine's UTPA prohibits trade practices that:

• **(a)** Misrepresent the character, extent, or status of a debt or obligation.

• **(b)** Employ deception, fraud, or false pretense to induce payments or compliance.

• **(c)** Violate the principles of good faith and fair dealing.

• **(d)** Relying on fraudulent assignments that were executed and recorded by entities with no authority over the alleged loan.

• **(e)** Omitting critical evidence, including the February and March 2017 "Allonge Sold" documents, to conceal material defects in the chain of title.

253. Defendants violated these provisions by knowingly misrepresenting material facts about the loan's ownership and enforceability, failing to honor Plaintiffs' cease-and-desist directive, and sending conflicting communications designed to obscure the truth and pressure Plaintiffs into compliance.

**Harm to Plaintiffs:**

254. Defendants' actions caused substantial harm to Plaintiffs, including:

• **Financial Losses:** Plaintiffs incurred expenses addressing misleading communications and responding to contradictory correspondence.

• **Emotional Distress:** Defendants' deceptive practices caused anxiety, confusion, and frustration.

• **Diminished Rights:** Defendants' misrepresentations impeded Plaintiffs' ability to challenge the legitimacy of the loan and protect their property rights.

• Obstruction of Plaintiffs' ability to uncover material defects in the chain of title due to Defendants'

omission of critical documents, including the February and March 2017 "Allonge Sold" documents.

255. The omission of these documents impeded Plaintiffs' ability to challenge Defendants' standing in prior legal proceedings, resulting in unjust outcomes and perpetuating wrongful collection actions.

**Legal Basis for Relief Under UTPA:**

256. Under Maine's UTPA, courts have recognized that:

• Misrepresentation of material facts in debt collection is an unfair trade practice.

• Violations of good faith and fair dealing principles warrant restitution and damages.

257. Plaintiffs satisfy all elements of a UTPA claim:

• **Unfair or Deceptive Practices:** Defendants knowingly engaged in deceptive communications and practices.

• **Causation:** Defendants' actions directly caused Plaintiffs financial and emotional harm.

• **Injury:** Plaintiffs suffered monetary losses and emotional distress as a result of Defendants' conduct.

**Relief Sought for UTPA Violations:**

258. Plaintiffs respectfully request the following relief:

**1. Declaratory Relief:** A judicial declaration that Defendants' conduct constitutes violations of the Maine Unfair Trade Practices Act **(5 M.R.S. § 205-A et seq.)**

**2. Restitution:** Full restitution of all payments made under false pretenses.

**3. Compensatory Damages:** Compensation for financial losses and emotional distress caused by Defendants' deceptive practices.

**4. Treble Damages:** Treble damages as authorized under UTPA for willful and egregious violations.

**5. Punitive Damages:** Punitive damages under Maine law to deter Defendants from engaging in future misconduct.

**6. Injunctive Relief:** An order prohibiting Defendants from continuing deceptive practices, including

false claims of ownership and misleading correspondence.

**7. Return of Fees and Costs:** An award of reasonable fees and costs incurred in addressing Defendants' violations.

**8. Expungement**: An order directing the Oxford County Registry of Deeds to remove the fraudulent July 2017 assignments and any other related documents that were improperly recorded as part of Defendants' deceptive practices.

This page intentionally left blank

# COUNT 8

## Violations of State Consumer Protection Laws

## (as to SPS and U.S. Bank)

259.    Plaintiffs incorporate all previous paragraphs herein by reference.

**Overview of State Law Violations Claim:**

260.    Plaintiffs allege that Defendants engaged in a pattern of unfair and deceptive trade practices, violating Maine's consumer protection statutes, specifically the Maine Unfair Trade Practices Act (**5 M.R.S.A. § 207**).

261.    **These violations include:**

**(a).** Submitting fraudulent documents to the Oxford County Registry of Deeds and in court filings, thereby misrepresenting ownership and authority over Plaintiffs' alleged mortgage.

**(b).** Misrepresenting their right to enforce the alleged debt despite clear evidence of fabricated indorsements, defective assignments, and conflicting note versions.

**(c).** Evading Plaintiffs' inquiries and failing to provide transparent information, perpetuating confusion about the legitimacy of their claims.

**Specific Allegations of Deceptive Practices**

262.    **Defendants' deceptive actions include:**

**(a).** Reliance on the fraudulent 2022 TBW Quit Claim Assignment and conflicting versions of the promissory note to assert authority over Plaintiffs' alleged loan. (**Exhibit K**)

**(b).** Deliberately ignoring Plaintiffs' formal requests for clarification regarding Note 2 and the chain of title, while continuing to assert enforcement rights. (**Exhibit L3**)

**(c).** Mailing contradictory letters, and refund checks designed to confuse Plaintiffs and induce compliance under false pretenses. (**Exhibit H3**)

**(d).** Issuing conflicting communications, such as U.S. Bank's denial of responsibility for the alleged

loan while directing Plaintiffs to SPS, which simultaneously refused to engage under the Cease and Desist letter, creating an evasive loop to avoid accountability. (**Exhibit H5 and H4**)

263.    The introduction and reliance on Note 7 (**Exhibit D2**), which contains fabricated indorsements and material alterations as defined under **UCC § 3-407**, constitute unfair and deceptive trade practices under Maine's Unfair Trade Practices Act (**5 M.R.S.A. § 205-A**). These acts were deliberately designed to mislead Plaintiffs and obscure Defendants' lack of legal standing to enforce the alleged debt. The use of a materially altered and void instrument not only violates established principles of equity but also caused substantial harm to Plaintiffs, warranting relief under Maine law.

**Harm to Plaintiffs**

264.    **Defendants' actions caused Plaintiffs significant harm, including:**

(a). **Financial Loss:** Plaintiffs expended significant resources on legal fees, property-related costs, and time-consuming efforts to address Defendants' deceptive practices.

(b). **Emotional Distress:** The prolonged uncertainty caused by Defendants' actions led to severe anxiety, panic attacks, and stress-related health conditions, as documented in medical records (**Exhibit M**).

(c). **Property Devaluation:** The clouded title caused by fraudulent recordings diminished the property's market value and undermined Plaintiffs' ability to sell, refinance, or freely enjoy their home.

**Conclusion**

265.    Defendants' actions violate Maine's consumer protection laws, specifically the Maine Unfair Trade Practices Act. Their unconscionable conduct, reliance on fraudulent documents, and deliberate misrepresentation caused substantial harm to Plaintiffs. Plaintiffs respectfully request this Court grant damages, restitution, injunctive relief, and any other remedies deemed just and appropriate under the law.

**Relief Sought**

266. Plaintiffs respectfully request that this Court grants:

**(a). Compensatory Damages:** For financial losses, emotional distress, and physical harm caused by Defendants' unfair and deceptive conduct. These damages reflect the significant impact of Defendants' fraudulent practices on Plaintiffs' well-being and financial stability.

**(b). Equitable and Additional Damages:** Pursuant to Maine's Unfair Trade Practices Act (**5 M.R.S.A. § 213**), Plaintiffs request that the Court award all appropriate relief, including restitution of payments wrongfully obtained, attorney's fees, and any further damages this Court deems just and equitable for each instance of unfair and deceptive trade practices.

**(c). Injunctive Relief:** Prohibiting Defendants from:

**(i)** Filing, recording, or enforcing claims based on fraudulent documents or misrepresented assignments.

**(ii)** Engaging in any deceptive trade practices, including misrepresentation of the legitimacy of loan documents or the authority to enforce the alleged debt.

**(d). Restitution and Disgorgement:** Requiring Defendants to return all funds wrongfully collected from Plaintiffs under false pretenses.

This page intentionally left blank

## COUNT 9

### Fraud on the Court

### (as to SPS and U.S. Bank)

267.    Plaintiffs incorporate all previous paragraphs herein by reference.

**Overview of Fraud on the Court Claim:**

268.    Plaintiffs allege that Defendants Select Portfolio Servicing, Inc. ("SPS") and U.S. Bank National Association ("U.S. Bank") perpetuated and relied on fraudulent documents and misrepresentations introduced during the 2010-2012 foreclosure proceedings. By continuing to use these falsified documents to assert ownership and enforce claims, Defendants obstructed justice and undermined the judicial process.

**Ongoing Reliance on Fraudulent Documents**

269.    Defendants, SPS and U.S. Bank, are alleged to have knowingly perpetuated reliance on fraudulent documents, including Notes 2, 4, and now Note 7, despite their fabricated indorsements and inconsistencies in the chain of title. While these Defendants may not have originally created these fraudulent documents, they actively benefited from their use, incorporating them as foundational elements of their claims of ownership, authority to collect payments, and enforcement of Plaintiffs' alleged mortgage.

270.    **The introduction of Note 7:** In November 2024, Defendants introduced Note 7, a derivative of Note 4, (**Exhibits D and D2**), which included fabricated and legally impossible indorsements. These indorsements conflict with both the recorded chain of title and earlier versions of the note, underscoring Defendants' ongoing intent to obscure ownership and standing. This introduction entrenches their reliance on documents already discredited in prior foreclosure and litigation proceedings, perpetuating fraud on the court by advancing claims they knew or should have known were invalid.

271. **Fraudulent Indorsements and Void Note:** The fabricated indorsements on Note 7, including an indorsement from Taylor Bean & Whitaker to American Bank and a subsequent special indorsement from American Bank to Bayview Loan Servicing, LLC, materially alter the note in violation of **UCC § 3-407**. These alterations render the note void under Maine's Uniform Commercial Code. Defendants knowingly relied on this fraudulent document in legal proceedings, attempting to mislead the court and Plaintiffs regarding their standing to enforce the alleged debt.

272. **Obstruction of Justice:** Defendants' actions represent a deliberate attempt to undermine the judicial process and obstruct justice by introducing Notes 2, 4 and 7 to:

**(a).** Assert standing in court proceedings.

**(b).** Induce Plaintiffs to enter into the alleged 2012 Loan Modification Agreement under false pretenses.

**(c).** Collect payments from Plaintiffs from 2012 through 2024.

273. As entities that directly benefited from these discrepancies, SPS and U.S. Bank had an obligation to investigate and disclose the inaccuracies to Plaintiffs and the court. However, despite receiving numerous certified correspondences from Plaintiffs over several years detailing these discrepancies, (**Exhibit L3**) Defendants failed to investigate or address the inaccuracies. Instead, they continued to rely on the fraudulent documents, using them to mislead the courts and perpetuate their fraudulent scheme.

**Submission and Omission of Fraudulent Notes**

274. Notes 2 and 4, submitted under oath during the South Paris District Court foreclosure proceedings and later during alleged loan modification discussions in the Superior Court, were indispensable to Defendants' fraudulent scheme. (**Exhibits B and D**) These documents:

**(a).** Propped up Defendants' claims of standing.

**(b).** Justified the enforcement of illegitimate rights under the alleged loan.

275. The omission of Notes 2 and 4 from subsequent filings and communications underscores their fraudulent nature and highlights Defendants' attempt to distance themselves from these documents, despite continuing to rely on their representations.

**Active Knowledge and Complicity**

276. **SPS's Role as Servicer:** Despite Plaintiffs repeatedly informing SPS of the discrepancies and fraudulent nature of the note indorsements and assignments, SPS continued to:

**(a).** Represent the legitimacy of the loan documents in communications with Plaintiffs.

**(b).** Transmit to Plaintiffs conflicting versions of the promissory note.

**(c).** Participate in legal proceedings, including notifications to state agencies, without addressing known issues. **(See Exhibits L and J)**

277. **U.S. Bank's Role as Trustee:** As trustee and purported owner of the loan, U.S. Bank:

**(a).** Had a fiduciary duty to act in good faith and verify the legitimacy of the documents it relied upon.

**(b).** Continued to enforce claims and collect payments based on the fraudulent indorsements contained in Notes 2, 4 and 7.

**Legal Precedent and Successor Liability**

278. Maine law provides that successor entities knowingly relying on fraudulent submissions may be held liable for fraud, unjust enrichment, or other equitable misconduct. The following principles support the imposition of liability and equitable relief:

**Fraud on the Court**:

**(a). Under M.R. Civ. P. Rule 60(b)(3),** relief from a judgment may be granted if it was obtained through fraud, misrepresentation, or other misconduct. Fraud on the court, which includes deliberate reliance on fabricated documents or intentional concealment of material facts, undermines the integrity of the judicial process. Courts have consistently held that such fraud warrants equitable relief, including vacating judgments, to restore fairness and judicial integrity.

**Successor Liability**:

**(b).** Successor entities that knowingly benefit from fraudulent practices may be held accountable under Maine law and equitable doctrines. For example, the principle of unjust enrichment, as recognized in the **Restatement (Third) of Restitution and Unjust Enrichment**, holds that parties who knowingly profit from another's misconduct are obligated to restore the benefits received. Successor liability applies when entities perpetuate or knowingly benefit from the wrongful acts of their predecessors.

**Fiduciary Accountability**:

279. Trustees and fiduciaries are bound by principles of equity to act in good faith, avoid conflicts of interest, and correct known discrepancies. As emphasized in the **Restatement (Third) of Trusts § 76**, fiduciaries who knowingly rely on fraudulent submissions or fail to disclose material facts breach their duties of loyalty and care and may be held liable for resulting harm.

280. Maine law's general principles of equity and common law fraud doctrines provide a comprehensive framework for holding entities accountable for perpetuating or benefiting from fraudulent conduct. These principles support Plaintiffs' claims for equitable relief, including vacating judgments, restitution, and the imposition of liability on successor entities that knowingly perpetuate fraud.

**Harm to Plaintiffs**

281. Defendants' use of fraudulent documents caused Plaintiffs significant harm, including:

**(a). Financial Harm:** Plaintiffs were compelled to make payments under false pretenses and incurred legal expenses to address these discrepancies.

**(b). Emotional and Physical Harm:** The prolonged reliance on fraudulent documents caused severe stress, anxiety, and documented medical issues. (**Exhibit M**)

**(c). Judicial Harm:** Plaintiffs were deprived of fair proceedings and subjected to an unjust legal outcome based on false representations.

**Conclusion**

282.    The existence and use of Notes 2 and 4 were indispensable to the Defendants' fraudulent scheme. These documents were submitted under oath in the South Paris District Court and served as the foundation for **(a)** proving standing to foreclose, **(b)** inducing Plaintiffs to enter into an alleged loan modification under false pretenses, and **(c)** transferring purported rights to collect under the alleged note to subsequent entities. The Defendants' actions constitute a clear case of fraud on the court. By knowingly relying on fraudulent documents and failing to address inaccuracies, Defendants undermined judicial integrity and perpetuated a scheme that caused Plaintiffs significant harm.

**Plaintiffs Request Relief To Rectify The Harm And Restore Judicial Integrity:**

283.    Plaintiffs respectfully request the following relief:

**(a). Sanctions:** Against SPS and U.S. Bank for reliance on fraudulent documents and failure to take corrective action, pursuant to **Maine Rules of Civil Procedure, Rule 60(b)(3)**, which allows for relief from judgment when obtained through fraud or misconduct. Plaintiffs further invoke general principles of equity, including those recognized in **Restatement (Third) of Trusts § 76** and **Restatement (Third) of Restitution and Unjust Enrichment**, which hold fiduciaries and other parties accountable for acts of bad faith, concealment, and unjust enrichment. These principles provide this Court with authority to impose equitable remedies to address fraud and misconduct that undermine judicial proceedings.

**(b). Vacatur of Prior Rulings:** Plaintiffs request that any adverse rulings issued in South Paris Superior and District Courts, Docket# **RE-10-85**, that were obtained through reliance on fraudulent submissions, be vacated. This request is made under **Maine Rule 60(b)(3)**, equitable principles, and general doctrines of fraud prevention, to rectify the harm caused by Defendants' misconduct and preserve judicial integrity.

**(c). Compensatory Damages:** Plaintiffs request compensatory damages for financial losses, emotional distress, and physical harm resulting from Defendants' misconduct. This request is based on Maine law,

including equitable relief doctrines and state principles governing fraudulent misrepresentation.

**(d). Punitive Damages:** Plaintiffs request punitive damages to deter willful and reckless fraud on the court. Under Maine law, punitive damages are authorized for egregious conduct demonstrating malice or reckless indifference to the rights of others, which Defendants' actions in this case clearly exemplify.

**(e). Referral to Authorities:** Plaintiffs request that this Court refer Defendants' actions to appropriate state authorities for investigation of potential violations of Maine fraud statutes and other applicable laws addressing fraudulent court submissions, to ensure accountability and prevent further misconduct.

This page intentionally left blank

## COUNT 10

### Fraudulent and Deceptive Trade Practices Under Maine Law

### (Violations of 5 M.R.S.A. § 207 and Common-Law Fraud)

### (as to SPS, U.S. Bank)

284.    Plaintiffs incorporate all previous paragraphs herein by reference.

**Overview of Claim:**

285.    This Count arises under Maine law, specifically:

(**a.**) The Maine Unfair Trade Practices Act (**5 M.R.S.A. § 207**): Prohibiting unfair or deceptive acts or practices in the conduct of trade or commerce; and

(**b.**) Common-law principles of fraud and fraudulent misrepresentation.

286.    Plaintiffs allege that Defendants Select Portfolio Servicing, Inc. ("SPS") and U.S. Bank National Association ("U.S. Bank") engaged in a deliberate and ongoing pattern of fraudulent and deceptive practices, causing substantial financial and emotional harm to Plaintiffs.

**Defendants' Wrongful Conduct**

287.    Defendants' actions violated Maine law by engaging in the following wrongful conduct:

**(a). Reliance on Fabricated Documents:**

**i.** Defendants knowingly relied on Notes 2, 4, and 7 (**Exhibits D and L**), each containing fabricated indorsements and falsified allonges, to assert false claims of ownership and enforce illegitimate debt collection   actions.

**ii.** Note 7 introduced fabricated special indorsements purporting to transfer ownership from American Bank to Bayview Loan Servicing, LLC—a legally impossible transaction given Bayview's absence from  the  chain  of  title  until  years  later.

This  page  intentionally  left  blank

**(b). Recording Fraudulent Assignments:**

**i.** Defendants filed and recorded fraudulent assignments in the Oxford County Registry of Deeds, including the July 2017 assignments by Bayview Loan Servicing and Bayview Dispositions, both of which had relinquished all rights to the alleged loan months earlier through "Without Recourse" transfers to Chimera Funding (**Exhibit K7**).

**ii.** These fraudulent assignments clouded Plaintiffs' title, creating substantial financial and legal burdens.

**(c). Misrepresentation of Ownership:**

**i.** Defendants repeatedly misrepresented the ownership and enforceability of Plaintiffs' mortgage loan to induce payments under false pretenses.

**ii.** These misrepresentations were made through communications, including letters, phone calls, and court filings, designed to mislead Plaintiffs about the legitimacy of Defendants' claims.

**(d). Concealment of Material Facts:**

**i.** Defendants intentionally concealed critical documents, including the February and March 2017 "Allonge Sold" documents, which evidenced prior relinquishment of rights to the alleged loan.

**ii.** Defendants' failure to disclose these documents obstructed Plaintiffs' ability to challenge the validity of the loan and exposed Defendants' lack of standing.

**(e). Unfair and Deceptive Trade Practices:**

**i.** Defendants' reliance on fabricated documents and their concealment of material facts constitute unfair and deceptive practices under Maine's Unfair Trade Practices Act (**5 M.R.S.A. § 207**).

**ii.** Such practices were willful, knowing, and intended to deceive Plaintiffs for financial gain.

This page intentionally left blank

**Causation and Harm to Plaintiffs**

288.    Defendants' wrongful conduct directly and proximately caused harm to Plaintiffs, including:

**(a). Financial Losses:** Plaintiffs unjustly paid over $164,469.18 in payments induced by Defendants' fraudulent conduct and misrepresentations.

**(b). Clouded Title:** Fraudulent recordings and assignments created legal and financial burdens, diminishing the value and marketability of Plaintiffs' property.

**(c). Emotional and Physical Harm:** Defendants' conduct caused Plaintiffs severe emotional distress, anxiety, and prolonged uncertainty about their home and financial future.

**Legal Basis for Claims**

289.    Violation of the Maine Unfair Trade Practices Act (**5 M.R.S.A. § 207**):

**(a).** Defendants engaged in unfair and deceptive acts or practices in the conduct of trade or commerce by knowingly relying on fabricated documents, recording fraudulent assignments, and misrepresenting material facts.

**(b).** These acts were willful and knowing violations of the UTPA, entitling Plaintiffs to treble damages under **5 M.R.S.A. § 213(1-A)**.

290.    **Fraud and Fraudulent Misrepresentation Under Maine Common Law:**

**(a).** Defendants made material misrepresentations regarding the ownership and enforceability of Plaintiffs' mortgage loan, knowing them to be false or with reckless disregard for the truth.

**(b).** Plaintiffs reasonably relied on Defendants' misrepresentations to their detriment, making payments and enduring harm as a result.

This page intentionally left blank

**Relief Requested**

Plaintiffs respectfully request that this Honorable Court grant the following relief:

**(a). Compensatory Damages:** For financial losses, emotional distress, and clouded title caused by Defendants' wrongful conduct.

**(b). Treble Damages:** Pursuant to **5 M.R.S.A. § 213(1-A)**, for Defendants' willful and knowing violations of the Maine Unfair Trade Practices Act.

**(c). Punitive Damages:** To deter Defendants' egregious misconduct and hold them accountable for their fraudulent and deceptive actions.

**(d). Declaratory Relief:** Establishing that Defendants' reliance on fabricated documents and fraudulent representations violated Maine law.

**(e). Injunctive Relief:**

i. Prohibiting Defendants from further collection efforts, foreclosure attempts, or misrepresentations regarding the alleged loan.

ii. Requiring Defendants to discharge any invalid liens on Plaintiffs' property.

**(f). Referral for Investigation:** Plaintiffs request that this Court refer evidence of Defendants' misconduct to the Maine Attorney General's Office for investigation of potential violations of state law.

This page intentionally left blank

## Count 11

### Fraudulent Foreclosure Action (2010-2012)

### (as to SPS, U.S. Bank)

291.    Plaintiffs incorporate all previous paragraphs herein by reference.

**Overview:**

292.    This count addresses the foreclosure action initiated by American Bank in October 2010 and dismissed in December 2012. Plaintiffs allege that this foreclosure action was filed without standing, relying on falsified documents and misrepresentations to the court. The same foundational defect—absence of the original wet-ink note—undermines not only the foreclosure action but also all subsequent claims to the alleged mortgage, including those by SPS and U.S. Bank as successors-in-interest.

**Factual  Allegations:**

**1. Filing Without Standing:**

293.    The foreclosure action was filed despite American Bank's lack of possession of the original promissory note and legal standing to enforce the alleged mortgage loan. **(Exhibits A-E)**.

294.    The introduction of Note 7 on November 18, 2024 **(Exhibit D2)**, further evidences Defendants' reliance on fabricated and fraudulent documents to assert standing. Note 7 incorporates elements of Note 4—used during the alleged 2012 loan modification agreement—but introduces a special indorsement from American Bank directly to Bayview Loan Servicing, LLC, dated nearly three years before Bayview's documented entry into the chain of title.

295.    This indorsement, alongside two additional alonges, contradicts the recorded assignments in the Oxford County Registry of Deeds. It highlights Defendants' continued manipulation of documents to obscure the absence of lawful ownership or standing. The recent emergence of Note 7 underscores the Defendants' ongoing efforts to conceal foundational defects while perpetuating the

illusion of legitimacy.

296. Defendants knew or should have known that the alleged note was fabricated and insufficient to support their claims.

**Fraudulent Misrepresentation to the Court:**

297. American Bank and its then-counsel, Bendett & McHugh—now merged with Brock & Scott PLLC—knowingly submitted false and misleading documentation to the court during the foreclosure action, including Note 2 **(Exhibit B)** and Note 4 **(Exhibit D)**. These documents were later contradicted by subsequent versions provided by Defendants.

298. The evasiveness of Attorney Santo Longo, representing Bendett & McHugh, underscores the firm's role in perpetuating the fraud. In August 2022, Plaintiffs sent a certified letter to Attorney Longo (**Exhibit G2**) requesting information about the authenticity of the promissory notes and their indorsements, specifically regarding Note 2, as submitted by Bendett & McHugh under oath during the foreclosure action. Despite repeated follow-ups, Attorney Longo refused to respond and later ceased communication entirely.

299. This deliberate silence and lack of accountability by Bendett & McHugh, now operating as Brock & Scott PLLC, underscores their complicity in facilitating fraudulent actions that have caused Plaintiffs significant harm. Plaintiffs are fully aware of the firm's role in perpetuating these actions and will take all necessary legal steps to ensure that all parties involved are held accountable for their misconduct.

**3. Severe Harm to Plaintiffs:**

300. The prolonged legal battle caused significant financial harm, legal fees, emotional distress (sleepless nights, anxiety), and physical harm (pregnancy losses, stress-related health issues).

**(See Exhibit M and M2 Medical Records)**

**New Medical Evidence Reinforcing Harm from Foreclosure Action:**

301.    Medical evidence from Dr. Deborah Hamilton **(Exhibit M)** directly attributes G. Paul Taitt's severe anxiety and associated physical symptoms to the 2011 foreclosure proceedings. The letter confirms that this anxiety required medical intervention and led to complications such as high blood pressure, chest pain, and difficulty managing daily activities. These health issues persisted for years due to the continued uncertainty and stress caused by the Defendants' fraudulent and deceptive conduct.

302.    Plaintiffs endured harassment, including sheriff visits, unannounced property inspections, and unwarranted anxiety about losing their home. (**see Exhibit G3**)

**Documented Harm Beyond Anxiety:**

303.    The impact of the 2010–2012 foreclosure action is alleged to have extended beyond financial and legal stress, deeply affecting the Plaintiffs' personal and emotional well-being. During this period, Heidi A. Taitt experienced two consecutive pregnancy losses (**Exhibit M2: Miscarriage Medical Reports, 2011**). While establishing a direct causal link between prolonged stress and miscarriage is challenging, medical research highlights the connection between sustained, high stress levels and increased risks during early pregnancy. The timing of these losses, amid the intense pressure and fear of the foreclosure proceedings, is alleged to have caused lasting emotional trauma. Plaintiffs continue to struggle with the possibility that foreclosure-related stress contributed to these painful events, compounding their suffering and underscoring the human cost of Defendants' actions.

**Evidence of Causal Link Between Foreclosure Action and Health Impacts:**

304.    The foreclosure action initiated by American Bank in 2011 serves as the foundational event that triggered G. Paul Taitt's ongoing health issues. The use of fabricated documents to initiate foreclosure proceedings created undue stress, emotional turmoil, and physical harm, as evidenced by contemporaneous medical records and the November 2024 letter from Dr. Hamilton.

This causal connection between Defendants' fraudulent actions and the Plaintiff's health outcomes substantiates the need for significant compensatory damages.

**Legal Claims:**

**1. Fraud on the Court:** The foreclosure action constitutes fraud on the court, undermining judicial integrity by relying on falsified documents and misrepresentations. This violates **Maine Rules of Civil Procedure, Rule 60(b)(3)**, which addresses relief from judgment based on fraud and misconduct.

**2. Malicious Prosecution:** Defendants pursued the foreclosure action in bad faith, without probable cause, and with an improper purpose, causing harm to Plaintiffs. This claim is supported by Maine common law principles addressing wrongful litigation.

**3. Intentional Infliction of Emotional Distress:**

305.    The reckless and intentional pursuit of a baseless foreclosure action inflicted severe emotional distress on Plaintiffs.

**4. Violation of Maine's Unfair Trade Practices Act (5 M.R.S. § 207):**

306.    Defendants' conduct violated principles of fairness and transparency, constituting deceptive and unfair trade practices under Maine law.

**Conclusion:**

307.    The foreclosure action initiated by American Bank in 2010 and pursued through 2012 represents a calculated attempt to unlawfully seize Plaintiffs' home, their real property. Defendants' actions demonstrate a clear violation of the Unclean Hands Doctrine, as they sought to benefit from a judicial process tainted by falsified documents, misrepresentations, and bad faith. Plaintiffs request full relief for the harms caused, including compensatory and punitive damages, as well as a referral to appropriate regulatory authorities for investigation of Defendants' conduct.

**Expanded Damages Resulting from Health Consequences:**

308.    The Plaintiffs' claim for damages extends beyond financial and emotional harm to

include documented physical harm suffered by G. Paul Taitt. The medical evidence provided by Dr. Hamilton (**Exhibit M**) underscores the severity of the harm inflicted and establishes a direct connection between the Defendants' fraudulent foreclosure action and years of medical intervention required to manage his health conditions. This evidence supports the Plaintiffs' request for punitive damages and reinforces the egregious nature of the Defendants' conduct.

309.    Furthermore, Plaintiffs assert that if Defendants fail to produce the original wet-ink promissory note in this matter, or refuse to do so, such failure will conclusively confirm the allegations set forth in Count 11 and <u>all other Counts in this Complaint</u>. This would establish that no party possessed legal standing or rights to initiate the 2010-2012 foreclosure actions or to execute any subsequent loan modification agreement. Defendants' inability or refusal to produce the original note underscores the fraudulent nature of their claims and their lack of lawful authority.

**Damages and Relief Requested:**

Plaintiffs respectfully request:

**(a).** Compensatory damages for financial losses, emotional distress, and physical harm caused by the 2010-2012 foreclosure action.

**(b).** Punitive damages for the egregious and fraudulent conduct of Defendants.

**(c).** Restitution of any fees or costs associated with the foreclosure action.

**(d).** A formal judicial determination that Defendants acted without standing and in bad faith.

**(e).** Plaintiffs respectfully request that this Court, in the exercise of its equitable powers, order the expungement of all assignments and recordings related to the subject property, dating back to Taylor, Bean & Whitaker and the original mortgage (March 2007), including all subsequent fraudulent recordings made by American Bank, U.S. Bank, SPS, and other entities in the chain of title. Such relief is necessary to restore the integrity of the public records, eliminate clouds on Plaintiffs' title, and ensure that the property is fully marketable and free of fraudulent encumbrances.

**(f). Restoration of Marketable Title:** Plaintiffs respectfully request that this Court issue an order restoring the title to its original, unencumbered state by eliminating all clouds, gaps, and fraudulent claims in the chain of title. Defendants' reliance on fabricated indorsements, invalid assignments, and concealed documentation constitutes bad faith and has rendered the title unmarketable. Pursuant to the court's equitable powers and its authority under Maine Rules of Civil Procedure, Rule 57, to grant declaratory relief, Plaintiffs seek an order voiding all fraudulent claims or encumbrances. Restoring marketable title aligns with the principles of Maine property law, which prioritize the integrity of recorded instruments and the equitable resolution of title disputes. This relief is necessary to ensure the property is free from fraudulent claims, enabling its rightful and lawful use.

**(g).** A declaration invalidating all fraudulent recordings, including the 2022 TBW Quit Claim Assignment and subsequent filings, as authorized under **Maine Rules of Civil Procedure, Rule 57**, and **33 M.R.S.A. § 201-A**.

Rest of page intentionally left blank.

**Count 12**

**Bad Faith Conduct and Deceptive Practices**

**(as to SPS, U.S. Bank)**

310.     Plaintiffs incorporate all previous paragraphs herein by reference.

## Overview and Nature of the Claim:

311.     Defendants Select Portfolio Servicing, Inc. ("SPS") and U.S. Bank National Association ("U.S. Bank") have engaged in a systematic and deliberate campaign of bad faith conduct and deceptive practices. Their actions were designed to evade accountability, obscure material facts, and perpetuate a fraudulent scheme, in violation of Maine's Unfair Trade Practices Act (**5 M.R.S.A. § 205-A**) and common-law principles of good faith and fair dealing.

• Refusing to address material discrepancies between multiple versions of the promissory notes, particularly Note 2;

• Evasion of direct inquiries regarding the existence, authenticity, and chain of indorsements of Note 2;

• Issuing contradictory, misleading, and confusing correspondence to obscure facts; and

• Engaging in deceptive tactics, including sending a $40 check to bait Plaintiffs into unwittingly validating the loan or waiving their claims.

These actions collectively demonstrate Defendants' violation of both statutory and common-law duties, underscoring their bad faith conduct and deceptive practices.

## Specific Allegations

312.     **Refusal to Acknowledge the Existence of Note 2:** Despite Plaintiffs' explicit inquiries and demands for clarity regarding Note 2, Defendants have deliberately avoided acknowledging the existence of multiple promissory notes in writing. This refusal, combined with Defendants' continued evasion of direct questions, constitutes a willful attempt to conceal fraudulent actions and defective documentation.

• **Recorded Call Admission:** The only acknowledgment of Note 2 occurred during a recorded telephone call. **(Exhibit J and J2 Call 3)** In this call, an SPS agent admitted that multiple notes existed and expressed uncertainty about which one was stamped in. However, Defendants have consistently avoided creating a written record of this acknowledgment, underscoring their intent to evade scrutiny and accountability.

• **Bad Faith Silence:** Defendants have refused to address the authenticity or chain of indorsements for Note 2, actively concealing material facts critical to Plaintiffs' rights and the integrity of the allegd loan documentation.

**Failure to Respond Substantively to Cease and Desist:**

313.    On October 2, 2024, Plaintiffs sent a formal Cease and Desist letter to Defendants (Exhibit I), requesting a comprehensive investigation into discrepancies between Notes 1 and 2. The letter also demanded an immediate halt to all collection and foreclosure activities until these critical issues were resolved.

Defendants failed to provide a substantive response, as required under Maine law, and instead continued to send misleading correspondence and collection notices. This refusal to address Plaintiffs' concerns and continued engagement in deceptive practices constitutes a clear violation of **5 M.R.S.A. § 207**, which prohibits unfair and deceptive trade practices.

**Specific failures include:**

 • **Failure to Address Note 2:** Defendants failed to acknowledge Note 2, which was central to Plaintiffs' letter and inquiries.

• **Failure to Investigate:** Defendants did not confirm possession of the original Note 2 or produce evidence substantiating its authenticity.

• **Continuing Collection Activities:** Despite being formally notified of the discrepancies, Defendants sent further correspondence ignoring Plaintiffs' demands and failed to resolve the issues raised,

continuing collection activities in violation of Maine law.

• **Brief Compliance Followed by Contradiction:** Defendants briefly complied with the Cease and Desist letter on November 12, 2024, but only after receiving Plaintiffs' Settlement Demand Letter **(Exhibit H4)**. However, Defendants soon resumed collection activities, directly contradicting their November 23, 2024, acknowledgment letter, in which they had agreed to cease and desist **(Exhibit H3)**.

**Misleading and Harassing Correspondence Post-Cease and Desist:**

314. Between November 11 and 13, 2024, Defendants sent multiple letters containing misleading and irrelevant information, as well as a $40 check designed to bait Plaintiffs into unwittingly validating the alleged loan.

**These actions demonstrate a calculated pattern of bad faith:**

• **Irrelevant Offers:** Defendants sent letters offering options such as a Deed in Lieu of Foreclosure and loan modification, despite Plaintiffs' explicit demand that all collection and foreclosure activities cease.

• **Contradictory Statements:** A November 11, 2024, letter claimed that the matter was "closed" but failed to address Note 2, the core issue raised in Plaintiffs' correspondence.

• **Deceptive Baiting Tactic:** SPS sent Plaintiffs a $40 check, accompanied by a vague explanation that it was a refund for "certain fees". The lack of detail surrounding the purpose of the refund raises concerns about its intent. Plaintiffs, recognizing this as a potential baiting tactic to waive claims or validate Defendants' disputed position, have declined to cash the check.

• **Continuing Harassment:** On November 13, 2024, Defendants sent another letter purporting to comply with Plaintiffs' Cease and Desist request, while simultaneously continuing to send notices—including payment instructions—to pressure Plaintiffs into resuming payments.

**Coordinated Bad Faith Conduct:**

315. **Barrage of Communications:** SPS and U.S. Banks deliberate decision to send 16 collection-related letters within five business days—despite the Cease and Desist directive and the ongoing dispute—constitutes harassment and a violation of Maine's Unfair Trade Practices Act. These actions demonstrate a coordinated effort to pressure Plaintiffs into compliance rather than address the substantive issues surrounding the loan's validity.

316. The introduction of Note 7 on November 18, 2024 **(Exhibit D2)**, epitomizes Defendants' bad faith conduct and deceptive practices. This document consolidates conflicting elements from prior notes, including Note 4, while introducing a fabricated special indorsement from American Bank directly to Bayview Loan Servicing, LLC—dated nearly three years before Bayview's documented entry into the chain of title. By relying on Note 7, Defendants have perpetuated the fraud surrounding Note 4, further obscuring the chain of title and material discrepancies that Plaintiffs have repeatedly sought to clarify. This calculated effort to misrepresent the true ownership of the loan and sustain a fraudulent scheme violates Maine's Unfair Trade Practices Act and breaches common-law duties of good faith and fair dealing.

317. **The disclosure of Note 7 underscores the extent of Defendants' bad faith conduct.** The fabricated and materially altered indorsements were introduced to obscure critical defects in the chain of title and mislead Plaintiffs regarding the legitimacy of the alleged loan. These alterations render the document void and unenforceable under established principles of Maine law. By deliberately relying on this fraudulent document, Defendants sought to evade accountability and further their scheme, in violation of Maine's **Unfair Trade Practices Act (5 M.R.S.A. § 205-A)** and breaching common-law duties of good faith and fair dealing.

318. **Contradictory Actions:** While SPS assured Plaintiffs on November 13, 2024, that it would cease collection efforts, the subsequent issuance of collection notices and state foreclosure

notifications reveals a pattern of intentional deception and bad faith.

319.    **Intent to Intimidate:** By issuing conflicting notices and involving state foreclosure resources, Defendants sought to intimidate Plaintiffs into compliance, knowing that their claims of ownership and authority remain unsubstantiated.

**Continued Obfuscation and Deceptive Practices:**

320.    Defendants have employed a deliberate strategy of obfuscation and deception to avoid accountability and obscure their fraudulent conduct:

• **Refusal to Address Note 2:** Defendants have never acknowledged or addressed Note 2 in writing, despite its central role in the 2012 loan modification and Plaintiffs' repeated inquiries. This omission underscores their intent to conceal fraudulent conduct.

• **Contradictory Ownership Statements:** Defendants have named Global Structured Finance—CIM Trust 2020-R3 as the current creditor but have failed to provide any recorded assignment or evidence supporting this claim. This lack of transparency further demonstrates bad faith and raises questions about the true ownership of the alleged debt.

• **Violations of Maine Law:** By continuing to send misleading correspondence, refusing to answer direct inquiries, and engaging in collection activities despite the Plaintiffs' Cease and Desist letter, Defendants have violated Maine's Unfair Trade Practices Act (**5 M.R.S.A. § 207**). These actions constitute unfair and deceptive practices under Maine law, further demonstrating Defendants' intentional disregard for legal protections afforded to Plaintiffs.

**Introduction of "Note 7" (Exhibit D2)**

321.    The transmission of Note 7 by SPS on November 18, 2024 **(Exhibit D2)**, represents a significant and new act of bad faith. This version of the note, presented as definitive, introduces material contradictions into the chain of title by including:

**1.** A fabricated special indorsement from Taylor Bean & Whitaker directly to American Bank—an

indorsement that is legally impossible, as Taylor Bean had already assigned the loan to MCMCAP Homeowners Advantage Trust IV on June 1, 2009, and ceased operations later that year following a federal investigation and bankruptcy. Furthermore, the alleged execution of this indorsement between 2011 and 2012 by Taylor Bean's Executive Vice President, Erla Carter-Shaw, is an impossibility, as she left the company the prior year in February 2010.

**2.** A fabricated special indorsement from American Bank directly to Bayview Loan Servicing, LLC— an indorsement that defies the recorded chain of assignments in the Oxford County Registry of Deeds and predates Bayview Loan Servicing, LLC's documented entry into the chain by nearly 3 years, making the transfer both physically and legally impossible.

322. By introducing this altered and fabricated note—containing two impossible indorsements—Defendants have demonstrated a willful intent to obscure material facts, fabricate standing, and perpetuate a fraudulent scheme. The indorsements, with the latter <u>never disclosed in over a decade of litigation and correspondence</u>, underscore Defendants' deliberate bad faith and calculated efforts to mislead Plaintiffs into believing the alleged loan was validly transferred.

Through this action Defendants have:

**1.** Ratified the fraudulent origins of earlier versions (Note 2 and Note 4);

**2.** Demonstrated a willful intent to deceive Plaintiffs and obscure the true ownership of the alleged loan;

**3.** Contradicted their own prior assertions, including those made in earlier correspondence; and

**4.** Exposed themselves as active participants in a pattern of bad faith conduct, designed to mislead Plaintiffs and perpetuate unlawful claims.

323. The introduction of Note 7 underscores Defendants' strategy of using deception and obfuscation to evade accountability and exploit Plaintiffs. This conduct violates Maine's Unfair Trade Practices Act **(5 M.R.S.A. § 205-A)** and breaches common-law duties of good faith and fair dealing.

By introducing a document with fabricated and contradictory indorsements, Defendants deliberately obscured material defects in the chain of title, perpetuating a scheme to enforce invalid claims and causing significant harm to Plaintiffs.

324. Defendants further demonstrated bad faith through their deliberate concealment of the February and March 2017 "Allonge Sold" documents, which conclusively show that Bayview Loan Servicing and Bayview Dispositions relinquished all rights to the alleged loan through "Without Recourse" transfers to Chimera Funding. These critical documents, omitted from the collateral file provided to Plaintiffs, underscore Defendants' calculated effort to obscure material facts and perpetuate their false claims of ownership.

325. The omission of these documents obstructed Plaintiffs' ability to challenge the legitimacy of the loan and defend against Defendants' collection activities. By knowingly withholding these documents while simultaneously relying on fabricated July 2017 assignments, Defendants perpetuated a scheme to misrepresent the chain of title and sustain their baseless claims.

326. This concealment of material evidence violates Maine's Unfair Trade Practices Act (**5 M.R.S.A. § 205-A et seq.**) and breaches the common-law principles of good faith and fair dealing. Defendants' actions demonstrate an intent to mislead Plaintiffs and to profit from a fraudulently manufactured chain of title. The deliberate omission of these critical documents underscores Defendants' bad faith and calculated efforts to obscure material facts, depriving Plaintiffs of the ability to protect their rights and challenge Defendants' claims effectively.

**Tolling of the Statute of Limitations:**

327. Defendants' calculated efforts to conceal material facts and evade accountability toll the statute of limitations under Maine law. Specifically:

• Defendants' refusal to address the authenticity of Note 2 or provide a clear chain of title constitutes ongoing fraudulent concealment, depriving Plaintiffs of the information necessary to protect their

rights. The sudden introduction of Note 7, featuring a previously undisclosed allonge indorsement from American Bank to Bayview Loan Servicing, LLC, highlights the Defendants' ongoing concealment of material facts regarding the validity of the documents and the alleged loan. In over a decade, neither Defendants and their predecessors have never presented Note 7 in its current form, despite more than seven years of written requests and inquiries directed to SPS and U.S. Bank. The deliberate withholding of this critical information provides irrefutable grounds to toll the statute of limitations. Under Maine law (**14 M.R.S. § 859**) and precedent in ***Anderson v. Neal, 428 A.2d 1189 (Me. 1981)***, fraudulent concealment tolls the statute of limitations when a defendant intentionally conceals the existence of a cause of action to prevent its discovery.

**Legal Violations:**

328.    Defendants' actions constitute violations of the Maine Unfair Trade Practices Act (**5 M.R.S.A. §§ 205-A and 207**). By issuing misleading correspondence, refusing to address discrepancies in the chain of title, and engaging in deceptive practices, Defendants violated Maine consumer protection laws, which prohibit unfair or deceptive acts in trade or commerce. Plaintiffs are entitled to seek remedies under **5 M.R.S.A. § 213** for the harm caused by Defendants' conduct.

**Harm to Plaintiffs:**

329.    Defendants' actions have caused significant harm to Plaintiffs, including:

• **Physical Harm and Emotional Distress:** Plaintiffs have suffered anxiety, stress, and frustration due to Defendants' evasive and deceptive practices, as well as the ongoing uncertainty surrounding the legitimacy of the loan documents.

• **Financial Harm:** Plaintiffs have incurred significant expenses, including legal fees, to investigate and counteract Defendants' misconduct.

• **Obstruction of Justice:** Defendants' concealment of Note 2 and refusal to provide transparency have denied Plaintiffs the ability to obtain a fair resolution and protect their rights.

**Relief Sought:**

330.  Plaintiffs respectfully request:

**1. Compensatory Damages:** For financial losses and emotional distress caused by Defendants' bad faith and deceptive practices.

**2. Punitive Damages:** For Defendants' intentional and egregious misconduct, including their concealment of fraud and continued harassment and deceptive tactics.

**3. Injunctive Relief:** Prohibiting Defendants from engaging in further collection or foreclosure activities unless and until they fully and transparently address the discrepancies surrounding Note 2 and provide conclusive proof of ownership and authenticity of the loan documents, in full compliance with Maine law.

**4. Statutory Damages:** Plaintiffs seek statutory damages under Maine's Unfair Trade Practices Act (**5 M.R.S.A. §§ 207 and 213**) for each instance of misleading and deceptive practices, including unauthorized communications sent after the Cease and Desist letter.

**5.** Plaintiffs request that the Court compel Defendants to produce the original February and March 2017 "Allonge Sold" documents or, in their absence, declare Defendants' claims to the alleged loan invalid due to the concealment of material evidence critical to the chain of title.

**Ultimate Demand for Production of Original Note and Consequences of Non-Compliance:**

331.  In light of overwhelming evidence of fraudulent document creation, conflicting note versions, shifting indorsements, and the <u>lack of any indorsement to U.S. Bank in the collateral file</u> provided by Defendants, Plaintiffs demand that Defendants produce the original wet-ink promissory note to prove their standing and authority. Failure to produce this unaltered document will confirm that Defendants lack any enforceable right to the note, invalidating their claim and exposing a fundamental lack of good faith.

332.     Defendants have repeatedly claimed possession of the original note in correspondence and phone recordings, inviting Plaintiffs to inspect it at their Utah facility.

These representations, coupled with their explicit admission in recent correspondence that "**under this heading you will find everything that is in the collateral file,**" indicate that the documents in Defendants' possession are purportedly complete. However, the collateral file, including Note 7, <u>lacks any valid indorsement or assignment to U.S. Bank or any trust it manages</u> (**Exhibit D2**). This glaring omission renders any foreclosure or standing claim based on the note legally insufficient, further exposing the fabrication that underpins Defendants' chain of title.

333.     Any claim by Defendants that the note is "lost" or otherwise unavailable directly contradicts their prior representations and confirms that Defendants knowingly disseminated false information. Such an admission substantiates Plaintiffs' allegations of multiple instances of misrepresentation and inducement. Moreover, reliance on a "lost note" affidavit would constitute an outright admission of either gross negligence or deliberate fraud. **(see Exhibit L)**

**Broader Implications of Non-Production:**

334.     The absence of the original wet-ink promissory note and failure to provide a valid chain of title further confirms the fraudulent nature of Defendants' claims. This lack of transparency and accountability underscores Defendants' deliberate violations of Maine law, warranting punitive measures under state fraud and consumer protection statutes.

335.     The absence of the original wet-ink note, coupled with the explicit omission of any indorsement or assignment to U.S. Bank in the collateral file, invalidates Defendants' current claims. This omission further confirms that the 2010–2012 foreclosure action, which relied on similarly defective and unverified documents, was filed without standing. Defendants, as successors-in-interest, cannot evade accountability for the fraud embedded in the chain of title, particularly as they continue to rely on the same fraudulent claims for enforcement today. Moreover, failure to produce the original

wet-ink promissory note with a valid chain of assignments to U.S. Bank or any trust it claims to manage will substantiate and underscore <u>all counts</u> in Plaintiffs' complaint.

336. The allegations in Count 10, supported by Defendants' documented actions, persistent misrepresentations, refusal or inability to produce the original wet-ink note, and the absence of any indorsement or assignment to U.S. Bank in the collateral file, demonstrate a deliberate and sustained pattern of fraudulent conduct under Maine law. Defendants' reliance on contradictory filings, fabricated documents, and unsupported claims of ownership reveals an orchestrated scheme to obscure material defects in the chain of title.

The original wet-ink note is the foundational document required to establish ownership and enforcement rights under Maine law. Defendants' failure to produce this note—despite repeated requests over more than seven years—constitutes conclusive proof of their fraudulent conduct. It also invalidates their claims of ownership and enforcement, exposing the fabricated nature of the supporting documents.

This failure further substantiates Plaintiffs' entitlement to treble damages under the Maine Unfair Trade Practices Act (**5 M.R.S.A. §§ 205-A and 213(1-A)**), punitive relief for egregious misconduct, and full accountability under state law. Defendants' actions represent a calculated scheme to mislead Plaintiffs, obstruct justice, and profit from fabricated claims of ownership.

**Plaintiffs' Compliance with Statutory Requirements Under 5 M.R.S.A. § 213(1-A):**

Plaintiffs provided Defendants with a written demand for relief on [date], as required under **5 M.R.S.A. § 213(1-A)**. This demand letter detailed Defendants' violations and outlined the damages sought. Despite Plaintiffs' good faith efforts to resolve the matter, Defendants failed to respond within the statutory 30-day period or otherwise engage in meaningful settlement discussions. Plaintiffs intend to present the demand letter and accompanying proof of delivery at trial to substantiate their compliance with the statutory requirements and Defendants' failure to engage in good faith settlement discussions.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE, Plaintiffs respectfully pray for the following relief:**

**1. Compensatory Damages:** Award compensatory damages for financial, emotional, and physical harm caused by Defendants' conduct as follows:

- **Count 1 – Fraudulent Misrepresentation:** $2,189,732.65 (includes financial harm of $164,469.18, emotional distress, and treble damages).

- **Count 2 – Fraudulent Scheme and Use of Communications to Defraud:** $2,404,911.98 (treble damages and harm caused by deceptive practices).

- **Count 3 – Contract Fraud:** $1,772,881.23 (includes financial harm tied to the fraudulent modification, emotional damages, and treble damages).

- **Count 4 – Breach of Fiduciary Duty:** $2,885,894.38 (emotional harm, punitive damages, and treble damages).

- **Count 5 – Unjust Enrichment:** $798,090.24 (restitution of $164,469.18, additional damages, and treble damages).

- **Count 6 – Filing of False Documents:** $2,404,911.98 (diminished property value, trust in public records, and treble damages).

- **Count 7 – Violations of Maine's Unfair Trade Practices Act (UTPA):** $1,923,929.59 (statutory damages, punitive damages, and treble damages).

- **Count 8 – Violations of State Consumer Protection Laws:** $3,847,859.18 (damages for obstruction of justice, punitive damages, and treble damages).

- **Count 9 – Fraud on the Court :** $3,847,859.18 (financial harm from legal costs, emotional distress, physical harm, and treble damages).

- **Count 10 – Fraudulent and Deceptive Trade Practices Under Maine Law :** $1,923,929.59 (emotional distress, physical harm, punitive damages, and treble damages).

- **Count 11 – Fraudulent Foreclosure Action (2010-2012):** $3,000,000.00 (compensatory damages for financial harm, emotional distress, and physical harm).

- **Count 12 – Bad Faith Conduct and Deceptive Practices:** $3,000,000.00 (damages for emotional distress, financial harm, and punitive relief).

    **Total Requested Compensatory Damages:** $30,000,000.

Plaintiffs seek $30 million in damages to reflect the full magnitude of harm caused by Defendants' conduct. This amount accounts for treble damages and potential taxation or reductions in any final judgment, ensuring Plaintiffs are made whole and that Defendants' egregious actions are appropriately deterred.

## 2. Punitive Damages:

**Award punitive damages for Defendants' willful and malicious misconduct, including:**

- Fraudulent Misrepresentation (Count 1).
- Filing of False Documents (Count 6).
- Fraudulent Foreclosure Action (Count 11).
- Bad Faith Conduct and Deceptive Practices (Count 12).

## 3. Treble Damages:

Award treble damages for eligible claims under Maine's Unfair Trade Practices Act (Counts 7, 8, and 10), as these claims involve deliberate, egregious conduct warranting enhanced penalties to deter future violations." **Statutory Damages**: "Award statutory damages for violations of Maine's Unfair Trade Practices Act for each instance of deceptive or unfair conduct cited in Counts 7, 8, and 10. These damages ensure Defendants are held accountable for ongoing violations

## 4. Restitution and Disgorgement:

Order Defendants to return all payments wrongfully collected, including:

- $147,217.24 in mortgage payments.
- $9,251.94 in trial payments.
- $8,000 in legal fees, taxes, and other outlays made in reliance on fraudulent claims.

**Total Restitution:** $164,469.18 (exclusive of interest).

Plaintiffs further request prejudgment interest at the statutory rate of 6% per annum, calculated from the date of each payment to the date of judgment. Based on an average retention period of six years, Plaintiffs seek an additional $59,208.91 in prejudgment interest, bringing the total <u>to **$223,678.09**</u>

5. **Declaratory Relief:**

Issue declarations that:

1. The 2012 Loan Modification Agreement is void ab initio (Counts 3 and 9).

2. Fraudulent documents, including fabricated notes and assignments, are invalid (Counts 6, 8, and 9).

3. Plaintiffs' title to 55 Thompson Lane, Hartford, Maine, is free and clear of any claims by Defendants based on fraudulent or fabricated documents (Counts 6 and 9).

4. All recorded assignments, corrective assignments, and mortgage-related filings against Plaintiffs' property dating back to the original 2007 TBW mortgage, including the 2017 Bayview Assignments and the 2022 TBW Quit Claim Assignment, are declared invalid and ordered expunged from the Oxford County Registry of Deeds.

## 6. Injunctive Relief:

Grant a permanent injunction to:

- Prohibit Defendants from engaging in collection or foreclosure actions based on fraudulent documentation (Counts 6, 7, 9, and 10).
- Compel the Oxford County Registry of Deeds to expunge all recordings and assignments tied to the subject property, dating back to the original 2007 TBW mortgage.

## 7. Production and Cancellation of the Original Promissory Note:

Order Defendants to produce the original wet-ink promissory note for inspection to verify authenticity and chain of ownership. Upon confirmation of any defect, order the note canceled to preclude further collection or enforcement actions based on invalid documentation. (Counts 1, 6, and 9)

## 8. Statutory Damages:

Award statutory damages under Maine's Unfair Trade Practices Act for violations cited in Counts 2, 7, 8, and 10.

**9. Attorney's Fees and Costs:**

Award reasonable attorney's fees (if applicable) and costs incurred by Plaintiffs under Maine's Unfair Trade Practices Act **(5 M.R.S.A. § 213)**. Plaintiffs request that these fees and costs be awarded separately to preserve the full compensatory and punitive damages awarded, ensuring that the harm suffered by Plaintiffs is fully addressed. Plaintiffs request that any settlement or judgment explicitly designate attorney's fees and costs as a separate component of the recovery, to ensure that damages awarded to Plaintiffs remain intact and undiminished.

**10. Additional Remedies and Referrals:**

Refer Defendants' misconduct to the Maine Attorney General's Office for investigation of violations of state law.

**11. Vacatur of Prior Rulings:**

Vacate all prior adverse rulings obtained through fraud on the court (Count 9).

**12. Other Relief as Deemed Just and Appropriate:**

Grant any further relief the Court deems just and equitable under the circumstances.

**13. Jury Demand:**

Pursuant to Rule 38 of the Maine Rules of Civil Procedure, Plaintiffs demand a trial by jury on all

issues triable as of right by a jury.

Respectfully Submitted,

**/s/ Heidi A. Taitt**
**Heidi A. Taitt, Pro Se Plaintiff**

**/s/ G. Paul Taitt**
**G. Paul Taitt, Pro Se Plaintiff**

Dated: January 27, 2025

**Mailing Address:**
55 Thompson Lane
Hartford, Maine 04220

Tel: 207-778-1969

Email: **paultaittusa@gmail.com**

We, Heidi A. Taitt and G. Paul Taitt, hereby certify that on the 27th day of January, 2025, A copy of the foregoing Amended Complaint was served via the Court's CM/ECF system upon all parties of record and via certified mail to Defendants' legal representatives at the address below.

**/s/ Heidi A. Taitt**

**Heidi A. Taitt, Pro Se Plaintiff**

**/s/ G. Paul Taitt**

**G. Paul Taitt, Pro Se Plaintiff**

Dated: January 27, 2025

**Copy to be sent to:**

Reneau J. Longoria, Esq.

Doonan, Graves & Longoria, LLC

100 Cummings Center, Suite 303-C

Beverly, MA 01915

VIA EMAIL AND CERTIFIED MAIL# **70220410000059181754**